**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
PATRICIA HUNTER

|  |  |
|---|---|
|  | Case No.: |
| Plaintiff, |  |
| -against- | COMPLAINT AND |
|  | JURY DEMAND |

PALISADES ACQUISITION XVI, LLC
PALISADES COLLECTIONS, LLC
SHARINN & LIPSHIE, P.C.
HARVEY SHARINN

Defendants.
------------------------------------------------------------------X

## INTRODUCTION

1.      In 2007, now-Plaintiff Patricia Hunter was sued by Palisades Acquisition XVI, LLC in Bronx Civil Court for a debt she did not owe. Ms. Hunter was never served with the papers in this lawsuit. Nevertheless, Palisades, which has a history of sewer service, filed a false affidavit of service with the Court, and obtained a default judgment against Ms. Hunter on June 19, 2007.

2.      Several years later, when Ms. Hunter was applying for a loan modification to make her mortgage payments more affordable, she discovered there was a judgment against her. She filed an Order to Show Cause and was able to vacate the judgment and have the case dismissed. Ms. Hunter believed she was free of the matter.

3.      Over a year later, Defendants unlawfully issued a restraining notice to JP Morgan Chase, purporting to be the judgment creditor even though there was no judgment in the case against Ms. Hunter. Chase then froze Ms. Hunter's bank account and withdrew nearly $1,000 of her funds. Ms. Hunter contacted Sharinn & Lipshie attempting to lift the unlawful restraint, but Defendants ignored her pleas. Ms. Hunter was deprived of her money, could not deposit her paychecks or pay her bills on time, incurred numerous fees, and suffered serious anxiety and emotional distress.

4.       Ms. Hunter now brings suit against Defendants – a putative judgment creditor, the judgment creditor's servicer, the judgment creditor's debt collection law firm, and that law firm's principal  – for

violating the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. and N.Y. Gen. Bus. Law § 349, and for committing conversion by executing on Ms. Hunter's bank account for a long-since vacated judgment in a case that had already been dismissed.

5.      This action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Because the dispute involves predominant issues of federal law under the FDCPA, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

7.      Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

8.      Venue in this federal district is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Bronx County, New York.

## PARTIES

9.      Plaintiff Patricia Hunter ("Ms. Hunter" or "Plaintiff") is an individual currently residing in Bronx County, New York.

10.     Defendant Palisades Acquisition XVI, LLC ("Palisades Acquisition") is a foreign limited liability company organized and existing under the laws of the State of Delaware. Palisades engages in business in New York and maintains a designated agent for service of process in New York.  Palisades Acquisition is the putative judgment creditor.

11.     Defendant Palisades Collection, LLC ("Palisades Collection") is a limited-liability company organized under the laws of Delaware. Palisades Collection has its principal place of business at 210 Sylvan Avenue, Englewood Cliffs, NJ 07632, but engages in business in New York and maintains a designated agent for service of process in New York. Palisades Collection is the servicer of Palisades Acquisition. While Palisades Acquisition (allegedly) owns the putative accounts, including putative

judgments, it collects through Palisades Collection, which takes the affirmative steps to collect the debts. These affirmative steps by Palisades Collection include collecting through sub-servicers, including debt collection law firms such as Sharinn & Lipshie, P.C. Therefore, Palisades Acquisition and Palisades Collection are collectively "the Palisades Defendants."

12.      Defendant Sharinn & Lipshie, P.C., ("Sharinn & Lipshie," or "S&L") is a debt collection law firm with its principal place of business located at 50 Charles Lindbergh Blvd., Ste. 604, Uniondale, NY 11553. Said Defendant engages in business in New York, and this suit arose out of said Defendant's business in New York.

13.      Defendant Harvey Sharinn ("Mr. Sharinn") is an individual who, upon information and belief, is a resident of the State of New York. Harvey Sharinn is an attorney at Sharinn & Lipshie and is personally engaged in the debt collection violations committed by S&L while doing business in New York. Therefore, S&L and Sharinn are collectively the "S&L Defendants."

14.    As the Palisades Defendants act through the S&L Defendants for the collection of the putative judgments, Palisades is jointly and severally liable for the acts of its agents, the S&L Defendants.

## STATEMENT OF FACTS

*Palisades obtains a default judgment against Ms. Hunter based on false representations.*

15.      Ms. Hunter is a 61-year-old woman living in the Bronx with her husband, Samuel Hunter, and their 26-year-old daughter, Nakima. The family has lived in their current home, located at 4375 Bruner Ave., Bronx, NY 10466, since May 2005. Ms. Hunter is a full-time home health aide, while Mr. Hunter works as a carpenter.

16.      On or about April 5, 2007, Ms. Patricia Hunter was sued by Palisades Acquisition on a debt she did not owe in *Palisades Acquisition XVI, LLC v. Patricia Hunter,* 023781-07/BX ("the collections lawsuit") in Bronx County Civil Court.

17.      A copy of the summons and complaint are attached as Exhibit A and incorporated by reference in their entirety.

18.     Palisades Acquisition sought to collect a putative debt for $2,572.21 (together with interest from November 3, 2006), which it asserted was owed originally to Direct Merchants Bank.

19.     Palisades Acquisition purports to be the owner of the debt.

20.     Ms. Hunter has never had an account with Direct Merchants Bank. To her knowledge, she has paid off every credit card she has ever had.

21.     In addition, Ms. Hunter was never sent and has never received from anyone a notice of the assignment of the putative Direct Merchants Bank account.

22.     Palisades Acquisition's counsel in the collection lawsuit was Wolpoff & Abramson, L.L.P., which is still listed in the New York State Unified Court System online database as the attorneys for Plaintiff.

23.     Ms. Hunter was never served with the lawsuit.

24.     Instead, Palisades, through its counsel, filed a false affidavit of service with the Court.

25.     A copy of this affidavit of service, dated April 24, 2007, is attached as Exhibit B and incorporated by reference in its entirety.

26.     In that affidavit, Loai F Sarsour (DCA License No. 1133309), a process server for AETNA Central Judicial Services, swore before a notary that on April 18, 2007 he served the summons and complaint on Ms. Hunter by delivering and leaving the documents with "James Hunter, relative" at 2375 Bruner Ave., 1st Fl., Bronx, NY 10466. Sarsour described James Hunter as a 55-year-old black man with black hair who was approximately 6' tall and weighed around 210 pounds.

27.     Loai Sarsour further attested that "James Hunter" told him that Ms. Hunter was neither in the military nor a dependent of a person in the military

28.     Loai Sarsour further attested that on April 24, 2007, he mailed a copy of the summons and complaint to Ms. Hunter at the same address, 2375 Bruner Ave., 1st Fl., Bronx, NY 10466.

29.     April 18, 2007 was a Wednesday.

30.     Although Ms. Hunter did live at that address in April 2007, she lived only with her husband, Samuel, and two young children. She is not related to and does not know anyone by the name of James

Hunter.

31.     Samuel Hunter does not match the description given in the affidavit of service, and would not have been home at 2:36 p.m. on the alleged day of service. In 2007, Samuel Hunter held two jobs – one as a carpenter and another doing general construction work. He also did carpentry odd jobs in his spare time. As a result of this busy schedule, he worked every weekday and used to come home from work around 9 p.m. or later.

32.     Mr. Hunter was never handed any papers relating to this case by Loai Sarsour or any other person. Neither he nor Ms. Hunter received any papers in the mail about this case from AETNA Central Judicial Services, Palisades Acquisition, Palisades Collection, or any other entity.

33.     Ms. Hunter was never served with process by any method, and in fact could not have been served in the way averred by the process server.

34.     Further, Sarsour has a history of perpetrating "sewer service," which refers to the practice of filing a fraudulent affidavit of service swearing that service has been made, when in fact service has not been made.

35.     On June 27, 2013, an amended class action complaint was filed in the Southern District of New York against Palisades Collection and several other debt collectors alleging, *inter alia*, that Palisades had obtained default judgment against scores of consumers via sewer service. Loai Sarsour was among the process servers described as participants in this scheme.

36.     The case is captioned as follows: Betty BERNHART, Fausto Brito, Charles Roberts, and Jorge Viruet, et al., v. ASTA FUNDING, INC., Asta John/Jane Does 1-20, Palisades Collection, LLC, Gary Stern, Palisades Collection John/Jane Does 1-20, Pressler & Pressler, LLP, Richard A. Franklin, Ralph Gulko, Mitchell E. Zipkin, and Pressler John/Jane Does 1-20, No. 13 Civ. 02935 (S.D.N.Y. 2013).

37.     A true copy of amended complaint in that case is attached as Exhibit C and incorporated by reference in its entirety.

38.     On information and belief, Palisades Acquisition and Palisades Collection knew that the affidavit of service in the collections lawsuit against Ms. Hunter was highly likely to be false.

39.     Nevertheless, Palisades Acquisition and Palisades Collection, through their lawyers, filed this fraudulent affidavit with the court or caused it to be filed with the court.

40.     In June 2007, Palisades Acquisition's prior attorneys filed an application for a default judgment. A true copy of this application is attached as Exhibit D and incorporated by reference in its entirety.

41.     Among the documents filed with this application was a Claim Affidavit signed by Palisades Acquisition employee Yoel Cruz before a notary. Cruz swore that she had "personal knowledge of the facts of this case." Cruz further swore that Defendant established an account with Direct Merchants Bank, used this account and incurred charges, and defaulted on this alleged obligation. Cruz further swore that Palisades had purchased the account for value.

42.     On information and belief, Cruz did not have personal knowledge of any of those facts.

43.     On information and belief, Cruz did not have personal knowledge of Direct Merchants Bank's business practices.

44.     On information and belief, Cruz did not have access to documents substantiating some or all of the facts contained in the affidavit at the time the affidavit was sworn.

45.     On information and belief, the Claim Affidavit was inadmissible and insufficient to prove the claim against Ms. Hunter on which Palisades sought a default judgment.

46.     Based on the numerous false representations and affidavits Palisades Acquisition and Palisades Collection filed, they obtained a default judgment on June 19, 2007 against Ms. Hunter for $2,834.13, including interests and costs.

47.     Ms. Hunter has uncovered several other default judgments against her involving credit accounts she never had. She believes she has been the victim of repeated identity theft, and that someone else may have opened the Direct Merchants Bank account in her name.

***Ms. Hunter vacates the judgment against her and the case is dismissed.***

48.     Ms. Hunter never received a copy of the default judgment or notice of entry in the mail.

49.     In early 2014, Ms. Hunter and husband went to their bank to see if they could modify the mortgage loan for their house because they could no longer afford the payments.

50.    The bank checked Ms. Hunter's credit and informed her that a judgment had been entered against her in this case. She was told she would need to resolve the matter in order to move forward with the modification.

51.    Anxious about preserving her home, Ms. Hunter promptly visited the Civil Legal Advice and Resource Office. With their assistance, Ms. Hunter filed a *pro se* Order to Show Cause ("OSC") in Bronx Civil Court on February 24, 2014, based on the fact that she was never served.

52.    A true copy of this Order to Show Cause is attached as Exhibit E and incorporated by reference in its entirety.

53.    Until shortly before the filing of the order to show cause, Ms. Hunter did not know and could not reasonably have known about the collection lawsuit or the default judgment.

54.    In the affidavit in support of the OSC, Ms. Hunter stated she was not aware of the suit or the judgment until she began the process of modifying the mortgage loan for her house, and her bank informed her that a judgment had been entered against her in this case.

55.    Ms. Hunter further stated she had never been served with a copy of the Summons and Complaint, that a copy of the Summons and Complaint had never been left with a person of suitable age and discretion at her residence, that a copy of the documents had not been attached to the door of her residence, and that she did not receive a copy of the documents in the mail.

56.    Deeming the application meritorious, the Court, Judge Paul A. Goetz presiding, signed the OSC, ceasing all collection attempts and setting a hearing for March 12, 2014.

57.    On that date, Palisades defaulted. The court, Judge Paul L. Alpert presiding, vacated the judgment against Ms. Hunter as well as any restraints and garnishments. The matter was adjourned to April 21, 2014 for trial.

58.    A true copy of the order vacating the judgment is attached as Exhibit F and incorporated by reference in its entirety.

59.    Palisades defaulted again on the trial date and the matter was dismissed.

                *Two years later, Defendants illegally restrain Ms. Hunter's bank account pursuant to a*

*vacated judgment and dismissed action.*

60.    The collections lawsuit against Ms. Hunter was filed by Palisades Acquisition and Palisades Collection through Wolpoff & Abramson LLP. See Ex. A.

61.    In 2010, Wolpoff & Abramson, Mann Bracken LLP and related entities were abruptly – within a matter of days –shut down due to the filing of a lawsuit by the Minnesota Attorney General, accusing these entities of perpetrating a massive scheme of fraudulent debt collection.  Consequently, the tens of thousands of debt collection lawsuits these firms had pending in New York courts were suddenly abandoned, and remained abandoned for years.  These facts are well known in the debt collection industry.

62.    Wolpoff & Abramson LLP are still listed as the attorneys for Plaintiffs in the eCourts system and on the docketing for the collections lawsuit against Ms. Hunter (CV-23781/07-BX). A true copy of eCourts listing for this case is attached as Exhibit G and incorporated by reference in its entirety.

63.    On information and belief, neither Wolpoff & Abramson nor Mann Bracken ever withdrew from the case, nor did Palisades Acquisition, Palisades Collection, Sharinn & Lipshie or Sharinn file a change of attorney form with the court or send such a form to Ms. Hunter.

64.    Sharinn & Lipshie now purports to be the attorney for Palisades in the collections lawsuit against Ms. Hunter.

65.    Sharinn & Lipshie, P.C. ("S&L") is a debt collection law firm that files hundreds of collection lawsuits seeking to collect putative consumer debts, as well as post-judgment executions.

66.    Harvey Sharinn ("Sharinn") is the president of Sharinn & Lipshie, according to the firm's website, and is the named partner at the firm.

67.    On or about November 11, 2015, Palisades, through Sharinn & Lipshie, issued an Information Subpoena and Restraining Notice under the collections lawsuit's index number and directed at JP Morgan Chase. The documents were personally signed by Sharinn, and stated that Palisades had a judgment against Ms. Hunter for $2,834.13. The papers demanded Chase answer the Information Subpoena and impose a restraint on any bank accounts Ms. Hunter had with Chase.

68.     A true copy of the Information Subpoena and Restraining Notice are attached as Exhibit H and incorporated by reference in their entirety.

69.     At the time the restraint was issued, Ms. Hunter had a consumer checking account and savings account with Chase.

70.     On or about November 16, 2015, a hold was placed on Ms. Hunter's checking account..

71.     The fact that the judgment against Ms. Hunter was vacated is publicly and easily accessible.

72.     A simple search on the Unified Court System's eCourts website (www.courts.state.ny.us/ecourts/) reveals that the judgment in *Palisades Acquisition XVI, LLC v. Patricia Hunter,* CV-23781-07/BX was vacated on default on February 24, 2014, and that the action was dismissed "NAP," or "no appearance plaintiff," on April 21, 2014.

73.     A copy of the eCourts "Motions Detail" screen and "Appearance Detail" screen for the collections lawsuit are attached as Exhibit I and incorporated by reference in their entirety.

74.     In other words, anyone with even the slightest knowledge of the court's publicly available computer records would have known (a) that as of November 11, 2016, there was no judgment in favor of Palisades and against Ms. Hunter in CV-23781/07-BX, and (b) that as of April 21, 2014, the case itself was no more, having been dismissed.

75.     Sewer service is notoriously widespread in New York City.[1] Defendants are among those that

---

1 For example, the Honorable Denny Chin, federal district judge for the Southern District of New York, recently made the following "findings of fact" in certifying a class action alleging a scheme to fraudulently obtain default judgments against more than 100,000 New York consumers:

I make the following findings of fact based upon the depositions, declarations, and exhibits submitted by the parties in connection with this motion [for class certification]….

Between January 2007 and January 2011, Samserv defendants performed service of process in 94,123 cases filed by Mel Harris in New York City Civil Court, 59,959 of which were filed on behalf of Leucadia defendants. Records maintained by defendants reveal hundreds of instances of the same process server executing service at two or more locations at the same time. On 517 occasions, defendants Mosquera, Lamb, and Andino, alone, claimed to be have performed service in two or more places at the same time. For example, Mosquera claimed to have performed service at four different locations at 1 p.m. on September 17, 2008. Lamb claimed to have performed service at two different locations at 6:59 p.m. on November 28, 2007. Andino claimed to have performed service at nine different locations at 4 p.m. on March 29, 2007. There were also many other occasions where multiple services were purportedly made so close in time that it would have been impossible for the process server to travel from one location to the other as claimed.

These facts, together with the high number of default judgments obtained by defendants, provide substantial support for plaintiffs' assertion that defendants regularly engaged in sewer service.

have perpetrated this type of scheme: in 2007, only *eight-and-a-half percent* of consumers sued in the New York City Civil Courts regarding debts allegedly owed to Palisades Collection appeared in court to defend themselves. Further, as described *supra,* the process server who allegedly served Ms. Hunter with the collections lawsuit had been accused of sewer service in June 2013, well before Defendants attempted to enforce the vacated judgment.

76.     There was therefore a strong possibility, which Defendants knew about, that the judgment against Ms. Hunter had been improperly obtained via sewer service – and, in fact, it was so obtained.

77.     Defendants seek to circumvent the court process. Palisades improperly obtained this judgment via sewer service, defaulted on two court appearances when Ms. Hunter sought to defend herself in the lawsuit, yet they nevertheless attempted to enforce a vacated judgment amount to which they have no right.

78.     Further, by signing and sending the Information Subpoena and Restraining Notice to Chase for execution against Ms. Hunter, Sharinn and the law firm implicitly represented to Ms. Hunter that they had performed a "meaningful review" of her case.

79.     However, on information and belief, Sharinn and the law firm did not perform a meaningful review of Ms. Hunter's case.

80.     If Sharinn and the law firm had performed a meaningful review of Ms. Hunter's case, they would have a) checked eCourts to determine whether an order to show cause had been filed or granted; b) ordered and examined the court file; c) determined whether a notice of assignment of the putative debt from Direct Merchants Bank to Palisades Acquisition had ever been sent to the consumer, and/or d) reviewed the prior attorney's file or the court file, especially given that the prior attorneys were well known to have abandoned tens of thousands of collection lawsuits.

81.     These steps are the bare minimum for an attorney review, as S&L itself has confirmed.

82.     On January 17, 2014, S&L's managing attorney, Amanda Moreno ("Moreno") was deposed in

---

*Sykes v. Mel Harris & Associates, LLC*, 285 F.R.D. 279, 283-84 (S.D.N.Y. 2012) *aff'd sub nom. Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015)(citations to record omitted).

connection with a Fair Debt Collection Practices Act lawsuit against another debt collector and law firm.

83.     A true copy of the pertinent excerpts of the transcript of this deposition is attached as Exhibit J and incorporated in its entirety.

84.     Moreno asserted under oath that S&L's policy is not to take action on a collection lawsuit commenced by another law firm until S&L has copied the entire court file or been forwarded the pleadings. Ex. N, p. 75 ¶¶ 11-18, 19-25; p. 77 ¶¶ 12-15.

85.     The purpose of this alleged policy, Moreno said, is to adhere to "a meaningful involvement standard where [they] review what is done by other attorneys to make sure that [they]'re following in the correct footsteps." Ex. N, p. 78, ¶¶ 8-12.

86.     That is, in the words of S&L's own managing attorney, a meaningful review of a case begun by an another attorney must be undertaken before taking any action on it. Such a review requires, at minimum, an examination of the underlying court file.

87.     Here, Sharinn and S&L were not the original attorneys who had obtained the judgment against Ms. Hunter, and a full seven years had elapsed since Palisades obtained the judgment through their prior attorneys.

88.     It was well known that the prior attorneys, Wolpoff & Abramson, had shut down due to accusations by the Minnesota Attorney General that they had perpetrated a massive scheme of debt collection fraud, and further that they had suddenly abandoned a huge volume of pending debt collection suits in New York.

89.     Knowing these facts and their own policy of meaningful attorney involvement, they should have looked at the underlying court file or at the very least conducted an eCourts search.

90.     Had they taken the two minutes required to conduct this online search, Sharinn and the law

firm would have immediately seen that the judgment against Ms. Hunter had been vacated and

that the lawsuit had been dismissed. Had they then ordered the court file, they would have seen that she had asserted she was never served and that the debt did not belong to her.

91.     In sum, they would have quickly understood they had no legal basis to restrain and garnish Ms. Hunter's checking account.

92.     Further, had they checked their client's file, they would have known no notice of assignment had ever been sent to Ms. Hunter.

93.     Instead, they conducted no meaningful review of the lawsuit case against Ms. Hunter, and on information and belief, issued the Information Subpoena and Restraining Notice based on a mass-produced form.

94.     In the alternative, if Sharinn and the law firm actually did perform a meaningful attorney review, then they intentionally signed and issued a restraining notice pursuant to a nonexistent judgment, and a debt which was not owed and upon which no notice of assignment had ever been sent.

***Ms. Hunter discovers her funds have been restrained***

95.     At Defendants' behest, Chase had placed a hold on Ms. Hunter's bank account on November 16.

96.     That same day, $75.00 were debited from Ms. Hunter's checking account under the transaction heading "Nas-Coal 16 Nov15678." This brought her balance down from $3,037.01 to $2,962.01.

97.     A true copy of Ms. Hunter's online account statement as of December 2015, reflecting this transaction, is attached as Exhibit K and incorporated by reference in its entirety.

98.     On or about November 25, 2015, Chase sent Ms. Hunter a letter informing her that a hold had been placed on her checking account in the amount of $5,668.26, at the request of a "judgment creditor." Enclosed with the letter was a copy of the Information Subpoena and Restraining Notice, the Information Subpoena, an Exemption Notice, and an Exemption Claim Form.

99.     A true copy of the letter from Chase, along with the accompanying documents, are attached as Exhibit L and incorporated by reference in their entirety.

100.    The bank restraint was the first time Ms. Hunter knew or could reasonably have known that the

collection lawsuit was filed against her or that a default judgment was entered against her.

101.    When the S&L Defendants issued the information subpoena and bank restraint, they know and intended for the bank to forward a copy of the same Ms. Hunter as required by state law.

102.    The information subpoena and the bank restraint were the initial communication from S&L to Ms. Hunter regarding the collection lawsuit and the sewer service judgment.

103.    However, the S&L Defendants did not provide Ms. Hunter the disclosures required by the FDCPA, specifically 15 USC 1692g(a), either in the initial communication or within 5 days of the initial communication.  These disclosures are particularly important here. Had the S&L Defendants provided the required disclosure before executing on the nonexistent judgment, Ms. Hunter would have been able to invoke her rights under 15 USC 1692g(b) to have sent a written dispute and demanded that Palisades and S&L Defendants cease collections, verify the validity of the vacated judgment, and provide a copy of the judgment.  Had Ms. Hunter had the opportunity to invoke her rights in this way, it is possible that a meaningful investigation by the Palisades and S&L, including searching for and providing a copy of the putative judgment, would have disclosed that the judgment had been vacated before Defendants actually removed funds from Ms. Hunter's accounts.

104.    When Ms. Hunter noticed the hold on her account, before she received the letter from Chase, she became extremely upset. She relied on her checking account to pay her bills, including her mortgage payments, due on the 15th of each month, and needed the money that was in the account at the time to meet her November obligations.

105.    Ms. Hunter's daughter attempted to make Ms. Hunter's bill payments through the bank account, but they did not go through.

106.    Ms. Hunter went to a Chase branch office multiple times to try to release the restraint on her account.

107.    On her first visit, the representative Ms. Hunter met with refused to take action and instead instructed her to contact S&L.

108.    On a later visit, however, a bank representative transferred $2,100 – the amount protected as

exempt by the Exempt Income Protection Act – to her savings account for her use, and then initiated transmission of her mortgage payment from her savings account.

109.     Immediately after this transfer, Ms. Hunter's balance was $862.01.

110.     Ms. Hunter is not sure of the exact day when she went to the bank. However, the transfer to her savings account appears on her bank statement on November 23, 2015. She also appears to have incurred an insufficient funds fee on the transfer made by a Chase employee to her savings account, which left her account balance at $793.00. The same day and the following day, several returned item fees from the bill payments her daughter had attempted to make hit her checking account.

111.     Because Ms. Hunter's mortgage payment was due on November 15, her November payment was late. Her lender charged her a late fee, which she paid the following month.

112.     Since her account was frozen, she was forced to pay her bills by other means, such as Western Union wire transfer, resulting in additional charges.

113.     Then, on December 2, 2015, Chase debited $937.01 from Ms. Hunter's account in a transaction also labeled "NAS-COAL." She subsequently incurred an extended overdraft fee and a service fee.

114.     On December 10, 2015, the date the last fee was debited, Ms. Hunter's bank balance sat at -$238.00.

### *Ms. Hunter attempts to have the illegal restraint lifted and her funds returned*

115.     Confused and desperate, Ms. Hunter was forced to seek legal assistance in order to end Defendants' illegal restraint of her funds. She retained CAMBA Legal Services, Inc. in a limited capacity to help her resolve this matter.

116.     On December 15, 2015, Ms. Hunter sent a letter to Palisades through their attorneys, Harvey Sharinn and Sharinn & Lipshie, P.C, informing them that the judgment had been vacated and demanding the restraint on her bank account be lifted and the funds returned to her. She included a copy of the order vacating the judgment. Ms. Hunter's letter further demanded that Sharinn & Lipshie provide her with documentation and information regarding the debt under the Fair Debt Collection Practices Act and the laws of the city of New York. Finally, she told the law firm not to contact her directly and instead to

communicate with her attorneys, CAMBA Legal Services, Inc., whose contact information she provided.

117.    A copy of this letter and the return receipt signed by an employee of the law firm are enclosed as Exhibit M and incorporated by reference in their entirety.

118.    However, Palisades and its law firm ignored her pleas. As a result of her funds being frozen, Ms. Hunter was forced to pay her bills late and via unconventional means, so that she incurred numerous fees.

119.    On January 8, 2016, Ms. Hunter accessed her account online and saw that a hold remained in place on her account. A printout of that screen is attached as Exhibit N and incorporated by reference in its entirety.

120.    That day, an employee of CAMBA Legal Services called Sharinn & Lipshie and spoke with attorney Mike Ponzio to request the release of Ms. Hunter's funds. Mr. Ponzio requested that CAMBA fax to S&L a letter of representation and copy of the vacatur.

121.    On January 11, 2016 Ms. Hunter's attorney at CAMBA faxed the requested letter of representation and vacatur to S&L, demanding that the restraint on Ms. Hunter's bank account be lifted and the funds withdrawn be returned to her.

122.    A true copy of this letter and the fax transmission confirmation are attached as Exhibit O and incorporated by reference in their entirety.

123.    On January 13, 2016, CAMBA received a fax from a "Holly Barrett" at Sharinn & Lipshie, asserting that S&L had faxed a letter to Chase on January 11, 2016 withdrawing the restraining notice against Ms. Hunter. A copy of the letter sent to Chase and the transmission verification was enclosed with the fax.

124.    A true copy of the fax from Ms. Barrett to CAMBA and its enclosures are attached as Exhibit P and incorporated by reference in their entirety.

125.    On or about January 27, 2016, S&L mailed to CAMBA a letter enclosing a check for $830.16, made out to Ms. Hunter, representing "monies received from the Marshal in connection with a levy at JP Morgan Chase Bank." The letter further explained that a second check in the amount of $106.85 "representing Marshal fees" would be forwarded to Ms. Hunter directly from the Marshal's office.

126.    A true copy of this letter is attached as Exhibit Q and incorporated by reference in its entirety.

127.    On or about February 3, 2016, Ms. Hunter received a check from the New York City Marshal in the amount of $106.85.

128.    On or about December 23, 2015, Chase had sent Ms. Hunter a letter informing her that her account was overdrawn by $238.00, and that she needed to make a deposit to cover that amount in order to keep her account open. Chase sent another such letter on or about January 5, 2016.

129.    Copies of both letters from Chase are attached as Exhibit R and incorporated by reference in their entirety.

130.    As described, Ms. Hunter's balance was overdrawn because Defendants had frozen and garnished her bank account. They had debited nearly $1000 from her. And as a result of the freeze, her attempts to pay her bills through her checking account had resulted in numerous returned item fees and late fees, causing her balance to dip well below $0.

131.    Ms. Hunter chose not to deposit any funds because she believed it had only been overdrawn as a consequence of Defendants' actions, and she was concerned that Defendants would simply freeze her account again.

132.    At some point after January 8, Chase permanently closed Ms. Hunter's checking and savings accounts.

133.    After receiving the checks from S&L and the Marshal's office, Ms. Hunter opened a new checking account at another bank and deposited the returned funds.

134.    Defendants' actions inflicted damages on Ms. Hunter. Ms. Hunter was deprived of the use of her money and her bank account, which caused her to incur numerous fees and costs.

135.    Ms. Hunter's mortgage payments are due on the 15th of the month; she uses her family's previous month's pay to make each payment via electronic bank transfer. When Defendants caused Ms. Hunter's bank account to be frozen on November 16, she feared she would not be able to pay on time, resulting in late fees or higher monthly payments that she could not afford.

136.    As a consequence of Defendants' actions, Ms. Hunter was forced to pay her mortgage late and by

wire transfer instead of electronic bank transfer, incurring a late fee and a Western Union charge. She could no longer use a bank account to deposit her paychecks, and was forced to pay a check casher $6 for each check she needed to cash.

137.    Worse, the stress of Defendants' unjust and unjustified actions caused her to suffer anger, frustration, anxiety, and other emotional distress.

138.    Ms. Hunter had been shocked there was a judgment against her when she first learned about it, but believed she had long since dealt with it. The restraint of her bank account revived this anxiety. During the winter of 2015, until and after the restraint was lifted, Ms. Hunter worried about it constantly.

139.    Ms. Hunter is a home health aide, and at the time of the events described in this complaint was working five shifts a week, a mix of days and nights. She is paid weekly, and brings home around $400 a week after taxes. Her husband, Samuel Hunter, works full-time as a carpenter, earning a little over $700 every two weeks.

140.    At the time, they lived with their adult daughter and teenage son. For Ms. Hunter and her family, every dollar counts. The restraint of her bank account and nearly $1000 of her meager income, plus the resulting fees and charges, was deeply destabilizing and upsetting.

141.    Ms. Hunter and her husband had already modified their mortgage once and she was afraid making a late payment on the mortgage would increase their payments to a level they could not afford.

142.    Ms. Hunter was constantly worried, distracted, and distressed about when the restraint would end and when she would get her money back. She feared Defendants might eventually wrongfully garnish her pay, or, if she opened another bank account to store her earnings, might garnish that as well.

143.    As a result, throughout the time when her bank account was closed, Ms. Hunter suffered from severe, recurring headaches, high blood pressure and a diminished appetite. She rarely cries, but found herself weeping when she was home alone. She prayed more frequently than usual.

144.    Ms. Hunter was unable to sleep at night because of the stress caused by Defendants' actions. She fell asleep worrying about it and woke up worrying about it, and slept fitfully.

145.    Ms. Hunter also incurred expenses and lost time in having to fight a default judgment acquired by

way of sewer service on a credit account she had never opened, and wrongful collections on a vacated judgment.

146.     Reasonable attorney's fees were also accrued in getting Defendants to cease their wrongful restraint and return of her money.

## FIRST CLAIM FOR RELIEF

### *Violations of the Fair Debt Collection Practices Act*

147.     Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs as though fully set forth herein.

148.     Defendants attempted to collect on a judgment against Ms. Hunter that had been vacated in a debt collection lawsuit that had been dismissed, by restraining and garnishing her bank account, and then ignoring her demand that her funds be released. In doing so, Defendants violated multiple sections of the FDCPA.

149.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

150.     Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." See S. Rep. No. 382, 95th Con., 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit

under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

151.    This action falls within the ambit of the FDCPA for the following reasons:

a.  The obligation Defendants allege is owed to them is a "debt" as defined by 15 U.S.C. § 1692a(5) because it derives from a credit card account that was used primarily for family, personal or household purposes.

b.  Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

c.  Palisades Acquisition is a "debt collector" because it purchases charged-off consumer accounts in bulk from putative original creditors, or purchases the right to collect debts that are already in default, then attempts to collect on them using the mails and telephone.

d.  Palisades Collection is the master servicer for Palisades Acquisition.  Palisades Collection is assigned rights to seek to collect the charged off consumer debts, title and ownership to the debt remain with Palisades Acquisition.

e.  Palisades Collection collects these debts directly or through sub-servicers. On information and belief, Sharinn & Lipshie is a subservicer for the putative debt it sought to collect from Ms. Hunter. On information and belief, Palisades Collection exercises control or has the right to exercise control over the accounts it sends to sub-servicers.

f.  At all times Palisades Collection was acting as the agent and purported master servicer of Palisades Acquisition in seeking to collect the putative debt from Ms. Hunter. It is therefore liable for the acts of Palisades Acquisition.

g.  Defendant S&L is a law firm whose principal purpose is the collection of debts. It regularly collects debts allegedly owed by consumers to others, through sending collection letters and other correspondence, filing lawsuits, and using post-judgment remedies including income executions and bank account restraints.

h.  S&L is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

i.   Defendant Harvey Sharinn is the president of S&L and personally engages in the above mentioned activities carried out by his firm. Like his firm, he regularly collects and attempts to collect debts owed or asserted to be owed to another by all the mechanisms enumerated above. Sharinn personally signed the Restraining Notice that caused Ms. Hunter's bank account to be restrained.

j.   Sharinn is a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

k.   The actions of Defendants enumerated in the above statement of facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

152.   Defendants materially violated the following sections of the FDCPA: 15 U.S.C. §§1692c, 1692e, 1692f, 1692g. By way of example and not limitation Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: failing to provide Ms. Hunter with required information about an alleged debt in response to her request for verification; using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; making the false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; communicating improperly with a third party; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

153.   Defendants' violations of 15 U.S.C. §1692, *et seq*., render it liable to Plaintiff.

## SECOND CLAIM FOR RELIEF
### *Violations of N.Y. Gen. Bus. Law §349*

154.   Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs as though fully set forth herein.

155.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

156.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h). An individual so injured may also be awarded treble damages and punitive damages.

157.    Defendants violated N.Y. Gen. Bus. Law § 349 by engaging in deceptive acts and practices in the conduct of their businesses that caused specific harm to Ms. Hunter and broadly impact consumers at large.

158.    Defendants Palisades Acquisition and Palisades Collection obtained a judgment against Ms. Hunter via sewer service, by making false representations in sworn affidavits submitted to the court.

159.    Defendants attempted to collect on a judgment that had been vacated and an action that had been dismissed.

160.    Defendants falsely, deceptively, and misleadingly represented to Ms. Hunter and to JP Morgan Chase that they had the right to take any legal or collection actions and to freeze Ms. Hunter's checking account.

161.    Defendants falsely, deceptively, and misleadingly refused to release Ms. Hunter's bank account despite having been provided with incontestable evidence that the judgment had been vacated.

162.    Defendants S&L and Sharinn sought to collect on a vacated judgment without performing any meaningful attorney review. Yet they falsely, deceptively, and misleadingly represented implicitly that they had, in fact, conducted such a review, by issuing to JP Morgan Chase a restraining notice and information subpoena that were then sent to Ms. Hunter by Chase.

163.    On their own acknowledgement, a meaningful review would have entailed conducting a brief public records search on eCourts and examining the underlying court file. Had they done this, they would have seen that the judgment was vacated and the underlying matter dismissed.

164.    These steps were particularly crucial given that it was widely known that the prior law firm had

been accused of fraudulent debt collection, and further had abandoned tens of thousands of debt collection lawsuits.

165.    Defendants have engaged in a pattern of attempting to collect on judgments assigned *en masse* to S&L by Palisades Acquisition and Palisades Collection for collection with no prior review by either Palisades entity and no meaningful attorney review by S&L. S&L is a firm with only three attorneys, including Sharinn, but files thousands of collection lawsuits and collects on tens of thousands of putative judgements each year.   This enormous volume coupled with the use of mass-produced forms also suggests a lack of meaningful attorney review.

166.    Their deceptive conduct towards Ms. Hunter is, therefore, the type of conduct that has a broad impact on consumers at large.

167.    Defendants knew or should have known – based on records readily available to the public on the Internet, information in the court file, and Ms. Hunter's written dispute – that they were attempting to collect on a judgment that had been vacated and an underlying lawsuit that had been dismissed.

168.    That the relevant steps may be taken in a matter of minutes and that S&L's own managing attorney has noted their importance show a high degree of moral culpability. Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law.

169.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

170.    Defendants' acts have caused injury and damages to Ms. Hunter, including, without limitation, the financial consequences of the restraint on her funds and the eventual closing of her bank account; the costs of mailing dispute letters; time wasted in disputing a debt she did not owe and that did not exist in the eyes of the law; the public embarrassment and humiliation of having a false judgment reported to her bank and of having her bank account frozen; lost wages; and emotional distress.

171.     As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law § 349, Plaintiff

suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, and punitive damages, together with costs and attorney's fees.

## THIRD CLAIM FOR RELIEF
### *Conversion*

172.    Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs as though fully set forth herein.

173.    A cause of action for conversion lies when a plaintiff establishes a) her legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with her property interest in defiance of her rights.

174.    Intent to possess another's property is not an essential element of conversion, nor does the converter need to take physical possession of the property. Any wrongful exercise of dominion over a piece of property by someone other than the owner constitutes a conversion.

175.    Property subject to conversion includes readily identifiable funds from a bank account.

176.    Here, Defendants froze Ms. Hunter's bank account without any authority to do so. They knowingly and fraudulently exercised dominion over her limited funds, interfering with her right to possession and ability to use her money for her and her family's expenses.

177.    Defendants then a) directed a New York City Marshal to seize Ms. Hunter's money and b) directed the Marshal to place Ms. Hunter's money in trust for the benefit and use of Defendants, and then to forward said funds to Defendants.

178.    Ms. Hunter gave notice of her legal ownership of the money in his account, and demanded its return and release.

179.    Defendants ignored this notice.

180.    Defendants' improper restraint of Ms. Hunter's money for an unreasonable period of time without qualification, which harmfully interfered with her right to control her own property, constitutes conversion.

181.    For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual

damages include, *inter alia*, loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's money, and resulting consequential damages resulting therefrom. Plaintiff suffered serious mental distress and disruption of her daily life.

## PRAYER

**WHEREFORE**, Plaintiff Patricia Hunter respectfully requests the following relief:

a.  A declaration that Defendants have committed the violations of law alleged in this action;

b.  An order enjoining and directing Defendants to cease violating N.Y. GBL § 349;

c.  Actual damages;

d.  Statutory damages under 15 U.S.C. § 1692k and N.Y. GBL § 349;

e.  Treble and punitive damages under GBL N.Y. GBL § 349;

f.  Punitive damages for conversion;

g.  Costs, disbursements and attorneys' fees under 15 U.S.C. § 1692k and N.Y. GBL § 349;

h.  Prejudgment and post judgment interest as allowed by law;

i.  All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  November 11, 2016
            Brooklyn, New York

Respectfully submitted,


/s/
_____
Divya Subrahmanyam, Esq., Of Counsel
Kathleen Ames, Esq., General Counsel
CAMBA Legal Services, Inc.
885 Flatbush Ave., 2nd Floor
Brooklyn, NY 11226
Phone: (718) 940-6311 ext. 79255
Fax: (718) 462-5537

Email: DivyaS@CAMBA.org


/s/
_____
Ahmad Keshavarz
THE LAW OFFICE OF AHMAD KESHAVARZ
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax: (877) 496-7809
*Attorneys for the Plaintiff*