Case 1:16-cv-08779-ER    Document 1-3    Filed 11/11/16    Page 1 of 43

Betty BERNHART, Fausto Brito, Charles Roberts, and..., 2013 WL 3939724...

2013 WL 3939724 (S.D.N.Y.) (Trial Pleading)
United States District Court, S.D. New York.

Betty BERNHART, Fausto Brito, Charles Roberts, and Jorge Viruet, individually and on behalf of all persons
similarly situated, Plaintiffs,
v.
ASTA FUNDING, INC., Asta John/Jane Does 1-20, Palisades Collection, LLC, Gary Stern, Palisades Collection
John/Jane Does 1-20, Pressler & Pressler, LLP, Richard A. Franklin, Ralph Gulko, Mitchell E. Zipkin, and
Pressler John/Jane Does 1-20, Defendants.

No. 13 Civ. 02935 (RPP)(JLC).
June 27, 2013.

Demand for Jury Trial

**Amended Class Action Complaint**

New York Legal Assistance Group Yisroel Schulman, Esq., Jane Greengold Stevens, of counsel, Danielle Tarantolo, of
counsel, Julia Russell, of counsel, 7 Hanover Square, 18th Floor, New York, NY 10004, Telephone: (212) 613-5000,
Facsimile: (212) 750-0820, Email: jstevens@nylag.org, Email: dtarantolo@nylag.org, Email: jrussell@nylag.org.

Hughes Hubbard & Reed LLP, Diane E. Lifton, Shannon F. Green, Meaghan C. Gragg, One Battery Park Plaza, New York,
New York 10004, Telephone: (212) 837-6000, Facsimile: (212) 422-4726, Email: lifton@hugheshubbard.com, Email:
greens@hugheshubbard.com, Email: gragg@hugheshubbard.com, Attorneys for Plaintiffs.

Plaintiffs Betty Bernhart, Fausto Brito, Charles Roberts, and Jorge Viruet, on behalf of themselves and all others similarly
situated, for their complaint, allege, upon personal knowledge as to themselves and information and belief as to other matters,
as follows:

## *PRELIMINARY STATEMENT*

1. Plaintiffs bring this class action on behalf of thousands of New York City residents who have been injured by Defendants'
scheme to fraudulently obtain and enforce consumer debt judgments worth millions of dollars, in violation of the Fair Debt
Collection Practices Act, 15 U.S.C. §§ 1601 *et seq.* (the "FDCPA"), the Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. §§ 1691 *et seq.* ("RICO"), New York General Business Law section 349, and New York Judiciary Law section
487.

2. This scheme was devised and executed by Asta Funding, Inc. ("Asta"), a publicly traded company in the business of
purchasing and collecting charged-off consumer debts; Asta's Chairman of the Board, President, and Chief Executive
Officer, Gary Stern ("Stern"); Asta's wholly owned subsidiary, Palisades Collection, LLC ("Palisades Collection," and,
together with Asta, Stern, Asta John/Jane Does 1-20, and Palisades Collection John/Jane Does 1-20, the "Asta Defendants"),
which brought thousands of consumer debt actions on Asta's behalf; the Asta Defendants' law firm, Pressler & Pressler, LLP
("Pressler"), which litigated the actions; and Pressler attorneys Richard A. Franklin ("Franklin"), Ralph Gulko ("Gulko"),
and Mitchell E. Zipkin ("Zipkin") (Pressler, together with Franklin, Gulko, Zipkin, and Pressler John/Jane Does 1-20, the
"Pressler Defendants").

3. In or around 2004, Asta and Palisades Collection began purchasing consumer telecommunications debt from AT&T
Wireless. At or around that same time, the Asta Defendants, under the direction of Stern, and their attorneys, the Pressler
Defendants, began a scheme to collect those debts through the use of mass litigation to obtain default judgments against
consumers without having, being able to obtain, or intending to obtain, the evidence necessary to prove their claims against

these consumers in court. As part of this scheme, Defendants sued thousands of individuals in the New York City Civil Courts-many of whom never owed any debt to AT&T Wireless in the first place-on the basis of mass-generated and baseless verified complaints, retained process serving agencies known to engage in "sewer service" to avoid notifying consumers of the lawsuits filed against them, and obtained entry of default judgments based on fraudulent affidavits. Defendants used and continue to use the improperly obtained default judgments to seize consumers' homes, wages, and other assets. Defendants refer to this scheme as the "legal strategy."

4. Over time, Defendants have used this scheme to extract from low-income New Yorkers millions of dollars that Defendants have not proved, and could never prove, are owed to them.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d), and 18 U.S.C. §§ 1961-68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because it is the judicial district in which Plaintiffs Fausto Brito and Charles Roberts reside, in which Defendants transact business, in which Defendants filed and litigated suits against Plaintiffs, and in which a substantial part of the events giving rise to the claims occurred.

## PARTIES

7. Plaintiff Betty Bernhart is a natural person residing at 30 Centre Mall, Apt. 1C, Brooklyn, New York.

8. Plaintiff Fausto Brito is a natural person residing at 611 East 149th Street, Apt. 5F, Bronx, New York.

9. Plaintiff Charles Roberts is a natural person residing at 3660 Waldo Avenue, Apt. 4H, Bronx, New York.

10. Plaintiff Jorge Viruet is a natural person residing at 1 134 E. 165th Street, Bronx, New York.

11. Defendant Asta is a corporation organized under the laws of Delaware. It has its principal place of business at 210 Sylvan Avenue, Englewood Cliffs, New Jersey. Asta is in the business of purchasing, liquidating, and managing defaulted consumer receivables, including credit card accounts and telecommunication accounts. Asta generates revenues and earnings primarily through the collection of these receivables, which it purchases at substantial discounts on their face value.

12. Defendants "Asta John/Jane Does 1-20" are persons associated with Defendant Asta who were involved in the violations of law alleged in this Complaint.

13. Defendant Palisades Collection is a limited-liability company organized under the laws of Delaware. Like Asta, Palisades Collection has its principal place of business at 210 Sylvan Avenue, Englewood Cliffs, New Jersey. Palisades Collection is a wholly-owned subsidiary of Asta. Palisades Collection's registered agent in the State of New York is C T Corporation System, 111 Eighth Avenue, New York, New York.

14. Defendant Stern is and was at all relevant times the Chairman of the Board, President, and CEO of Asta. Defendant Stern also is and was at all relevant times a Principal of Palisades Collections.

15. Defendants "Palisades Collection John/Jane Does 1-20" are persons associated with Defendant Palisades Collection who were involved in the violations of law alleged in this Complaint.

16. Together, Defendant Asta, Defendant Asta John/Jane Does 1-20, Defendant Palisades Collection, Defendant Stern, and

Case 1:16-cv-08779-ER    Document 1-3    Filed 11/11/16    Page 3 of 43

Betty BERNHART, Fausto Brito, Charles Roberts, and..., 2013 WL 3939724...

Defendant Palisades Collection John/Jane Does 1-20 are the "Asta Defendants."

17. Each of the Asta Defendants is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), in that each is in the business of purchasing and collecting on defaulted debts that were originally owed to other entities.

18. Defendant Pressler is a New Jersey limited liability partnership with its principal place of business at 16 Wing Drive, Cedar Knolls, New Jersey. Pressler also maintains offices at 305 Broadway, 9th Floor, New York, New York, among other locations. Pressler is a law firm and is regularly engaged in the business of collecting consumer debts via the mail, telephone, internet, and civil debt collection lawsuits, on behalf of its clients, including, but not limited to, Palisades Collection and Asta.

19. Defendant Franklin is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Franklin regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

20. Defendant Gulko is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Gulko regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

21. Defendant Zipkin is a natural person and an attorney who was at all relevant times employed at Pressler. Defendant Zipkin regularly collects consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.

22. Defendants "Pressler John/Jane Does 1-20" are persons associated with Defendant Pressler, who were involved in the violations of law alleged in this Complaint.

23. Together, Pressler, Pressler John/Jane Does 1-20, Defendant Franklin, Defendant Gulko, and Defendant Zipkin are the "Pressler Defendants."

24. Each Pressler Defendant is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), in that each is regularly engaged in the business of collecting consumer debts via the mail, telephone, internet, and civil debt collection lawsuits on behalf of their clients, including, but not limited to, Palisades Collection and Asta.

### FACTS CONCERNING DEFENDANTS' SCHEME

#### Asta, Palisades Collection, and the Debt-Buying Industry

25. Defendant Asta is among the nation's largest "debt buyers"-that is, it buys defaulted, charged-off debts for pennies on the dollar, and then seeks to collect the full face value of the debts for profit.

26. Asta generates revenues primarily through collecting on purchased consumer debts, including through litigation.

27. Palisades Collection is a wholly owned subsidiary of Asta, and also is in the business of purchasing and collecting defaulted consumer debts.

28. Palisades Collection is run by the same management team that directs Asta, and Asta completely controls the activities of Palisades Collection. Asta's management, including Defendant Stern, considers Palisades Collection to be Asta's in-house debt collection agency.

29. The Federal Trade Commission (the "FTC") is charged with enforcing the FDCPA, which was enacted in 1977 to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e).

30. In fulfilling its duties under the FDCPA, the FTC undertook a multi-year investigation of the debt buying industry, which

culminated in a report published in January 2013. Federal Trade Commission, The Structure and Practices of the Debt Buying Industry (Jan. 2013), *available at* www.ftc.gov/os/2013/01/debtbuyingreport.pdf (the "FTC Report").

31. As part of that investigation, the FTC obtained voluminous documents from Asta and similar consumer debt-buying companies.

32. In the FTC Report, the FTC found that the growth of the debt buying industry "raise[s] significant consumer protection concerns," since "debt buyers[] may have insufficient or inaccurate information when they collect on debts, which may result in collectors seeking to recover from the wrong consumer or recover the wrong amount." *Id.* at i. The information that the FTC collected from Asta and other top debt buyers demonstrated that "the sufficiency and accuracy of the information used in the collection of debts remains a significant consumer protection concern." *Id.* at 50.

33. At FTC-sponsored roundtable discussions of debt collection in 2009 and 2010, at least two New York City legal services organizations reported improper litigation activity of Palisades Collection consistent with the violations of law alleged in this Complaint.

### The Asta Defendants Purchased Telecommunication Consumer Debt From AT&T Wireless

34. In or around 2004, Asta and/or Palisades Collection, at the direction of Stern, began purchasing telecommunications debts. By no later than 2005, these purchases included both landline and wireless consumer debts from AT&T Wireless.

35. Specifically, beginning in or around July 2004, Asta and/or Palisades Collection, at the direction of Stern, entered into a series of agreements to purchase defaulted debts from AT&T Wireless (the "Purchase and Sale Agreements").

36. Asta and/or Palisades Collection purchased these debts for pennies on the dollar.

37. On average, the country's largest debt buyers, including Asta, paid only four cents for each dollar of charged-off debt that they purchased between July 2006 and June 2009. FTC Report at 23, A-1.

38. For debts purchased under the Purchase and Sale Agreements, the Asta Defendants received from AT&T Wireless a spreadsheet containing limited information about each account-specifically, the account holder's name, social security number, telephone number, address, account open date, last payment date, charge-off date, and alleged amount owed.

39. Such spreadsheets containing the information provided from debt sellers to buyers are often referred to in the industry as "media" or "stream of data." FTC Report at 34-35.

40. It is typical in the debt-buying industry that debt buyers do not purchase the documentation underlying each account. *Id.* at 37, T-11.

41. Top debt buyers, including Asta, did not obtain a single document for eighty-seven percent of the debt portfolios (containing 3.9 million accounts) that they purchased between March and August 2009. *Id.* at 35-36.

42. At the time they purchased debts from AT&T Wireless, Asta and/or Palisades Collection did not obtain the original documentation underlying each debt. For example, they rarely, if ever, obtained any account agreements, account applications, signed contracts, original billing statements, payment records, or dispute histories.

43. The written agreements governing debt purchasing transactions typically include a disclaimer that the information regarding the debts sold may be inaccurate or incomplete, and that the debt buyer may be without recourse against the seller when that is the case. *Id.* at C-8.

44. On information and belief, the Purchase and Sale Agreements included such a provision.

45. Many debt purchase and sale agreements provide that the debt buyer may go back to the original creditor and obtain

Case 1:16-cv-08779-ER    Document 1-3    Filed 11/11/16    Page 5 of 43

Betty BERNHART, Fausto Brito, Charles Roberts, and..., 2013 WL 3939724...

account documentation for only a limited period of time, and/or in only a limited number of accounts, and/or only for additional fees. *Id.* at 39-40.

46. The Purchase and Sale Agreements provided that Asta and/or Palisades Collection could obtain some underlying account documentation from AT&T only for a limited period of time after they purchased the debts. The Purchase and Sale Agreements also provided that, even within that time period, Palisades Collection could obtain that documentation only for a limited percentage of accounts and/or only upon payment of additional fees.

47. AT&T generally did not provide Asta and/or Palisades Collection signed contracts or certain other categories of account documentation.

48. AT&T generally did not provide any account documentation whatsoever to Asta and/or Palisades Collection with respect to certain customer accounts.


***The Pressler Defendants, at the Direction of the Asta Defendants, Commenced Thousands of Lawsuits Without Proof or Review***

49. By 2005, Asta and/or Palisades Collection, under the direction of Defendant Stern, had implemented a scheme to collect purchased debt from consumers through litigation.

50. Defendant Stern called this scheme the "legal strategy."

51. The "legal strategy" scheme involved the use of mass litigation, by and through the Pressler Defendants, to obtain default judgments against consumers on claims for purchased debts, including the AT&T Wireless debts, and use those judgments to seize consumers' homes, wages, and other assets.

52. The Asta Defendants were unconcerned about potential countersuits by the alleged debtors over any wrongful acts Defendants undertook as part of the "legal strategy" scheme, viewing potential countersuits arising out of their wrongful acts as part of their overhead-simply another potential cost of doing business.

53. The Asta Defendants retained the Pressler Defendants to commence lawsuits on behalf of Palisades Collection to collect purchased AT&T Wireless debts from New York City consumers.

54. Asta Defendants and Pressler Defendants together developed and implemented the Pressler Defendants' litigation strategy.

55. The Asta Defendants agreed to pay the Pressler Defendants a percentage of monies collected on these debts.

56. Pursuant to the Asta Defendants' retainer agreement with Pressler, Pressler was required to provide the Asta Defendants with monthly reports, and the Asta Defendants were permitted to conduct audits of the Pressler Defendants' implementation of the Defendants' litigation strategy.

57. Primarily in 2005 and 2006, the Pressler Defendants, at the direction of the Asta Defendants, commenced thousands of lawsuits in the name of Palisades Collection seeking to collect purported AT&T Wireless debts.

58. In 2006, Palisades Collection was the plaintiff in approximately thirty-nine percent of all consumer credit filings in New York City Civil Court-more than any other consumer credit plaintiff.

59. In 2006, Pressler served as plaintiff's counsel in approximately one-third of all consumer credit filings in New York City Civil Court--more than any other law firm.

60. In 2005, Palisades Collection was the plaintiff in nearly 34,000 cases in New York City Civil Court.

61. Pressler represented Palisades Collection in nearly 20,000 of those cases.

62. In 2006, Palisades Collection was the plaintiff in more than 60,000 cases in New York City Civil Court.

63. Pressler represented Palisades Collection in over 38,000 of those cases.

64. In 2007, Palisades Collection was the plaintiff in more than 12,000 cases in New York City Civil Court.

65. Pressler represented Palisades Collection in approximately 1,500 of those cases.

66. On information and belief, the vast majority of the nearly 60,000 lawsuits Palisades Collection and Pressler filed in 2005, 2006, and 2007 were to collect AT&T Wireless debts.

67. Defendants often commenced hundreds of these suits on the same day.

68. The Pressler Defendants, at the direction of the Asta Defendants, initiated each suit with a verified complaint.

69. These verified complaints were all generated using the same form and were virtually identical to one another. The primary differences were the names of the defendants, the account numbers, and the amounts sought.

70. Each complaint stated: "This communication is from a debt collector."

71. Each complaint was signed and verified by a Pressler attorney, including Defendants Franklin and Gulko.

72. In the verification accompanying each complaint, the Pressler attorney stated on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which the attorney believed to be true. The verification also stated that the Pressler attorney was "in possession of the salient papers in connection with the action."

73. Under New York law, every court filing must contain an attorney's signature. That signature represents the attorney's certification that "to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of the paper or the contentions therein are not frivolous." 22 N.Y.C.R.R. § 130-1.01a(b).

74. At the direction of the Asta Defendants, the Pressler Defendants prepared and filed these complaints, the allegations of which were based only on the "stream of data" or "media" provided by AT&T Wireless, and some information obtained by Defendants about events, such as bankruptcies, deaths, or payments to Pressler, that took place after the events supposedly giving rise to the complaint.

75. Defendants rarely, if ever, reviewed each consumer's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before preparing and filing each complaint.

76. Defendants did not have access to, and therefore never reviewed, any documents regarding the specific consumer's alleged account before filing suit.

77. The Pressler attorney's verification that he or she was "in possession of the salient papers in connection with the action" was false.

78. Some of the complaints stated that the consumer "entered into a Goods and/or Services Contract with the plaintiff," *i.e.,* Palisades Collection. These statements were false.

79. Each of the complaints pleaded, *not* on information and belief, that "Plaintiff and/or AT&T Wireless has mailed monthly statements required by the agreement to defendant(s)." At the time the Pressler attorney verified that the statement was true, he or she did not know whether the statement was true.

80. The "stream of data" or "media" provided by AT&T Wireless did not contain any information regarding monthly

Case 1:16-cv-08779-ER    Document 1-3    Filed 11/11/16    Page 7 of 43

Betty BERNHART, Fausto Brito, Charles Roberts, and..., 2013 WL 3939724...

statements.

81. Many complaints sought interest on the amount allegedly owed to Palisades Collection. Defendants did not have access to, and never reviewed, the alleged contracts before preparing and filing these complaints. Defendants therefore did not know whether any interest was authorized and, if so, what rate of interest applied.

82. Defendants did not conduct a meaningful review of the consumer's alleged account before filing each complaint.

83. Defendants knew at the time they filed each complaint that they lacked and would lack admissible evidence sufficient to prove the claims stated therein.

84. Defendants knew at the time they filed each complaint that they did not have, and likely would not be able to obtain, the consumer's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history during the course of the litigation.

85. On information and belief, at the time they filed each complaint, Defendants did not intend to obtain the consumer's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history during the course of the litigation.

86. Defendants filed many lawsuits to collect alleged AT&T Wireless debts against consumers who in fact did not owe a penny to AT&T Wireless, and in some cases, had never opened AT&T Wireless accounts.


*Defendants Used Fraudulent Affidavits To Obtain Default Judgments*

87. The Pressler Defendants retained process serving agencies in connection with the lawsuits to collect AT&T Wireless debts.

88. The Pressler Defendants have a history of retaining process serving agencies that engage in sewer service.

89. "Sewer service" refers to the practice of filing a fraudulent affidavit of service swearing that service has been made, when in fact service has not been made.

90. Defendants knew that the process serving agencies the Pressler Defendants retained commonly engaged in "sewer service."

91. In 2008, the New York State Attorney General, on behalf of the Chief Administrative Judge of New York, sued Pressler and thirty-four other debt collection law firms for filing false affidavits of service prepared by a process serving company that engaged in sewer service, and seeking default judgments based on those fraudulent affidavits.

92. On information and belief, Pressler entered a consent order under which it agreed to undertake procedures for vacating default judgments obtained in cases where American Legal Process was retained to serve process.

93. On information and belief, the fraudulent practices for which the New York State Attorney General sued Pressler are not limited to that particular process serving agency, but are standard among the other process serving agencies retained by the Pressler Defendants.

94. For example, in 2011, the New York City Department of Consumer Affairs ("DCA") initiated disciplinary proceedings against AAA, the process serving agency that served named Plaintiffs Fausto Brito and Charles Roberts, resulting in a consent order entered in December 2011.

95. The DCA also initiated disciplinary proceedings against Executive Attorney Services, Inc., the process serving agency that served named Plaintiff Betty Bernhart, resulting in a consent order entered in March 2012.

96. The DCA, in October 2012, refused to renew the license of process server Robert Winckelman, who served named Plaintiff Betty Bernhart, because of a multitude of violations of the rules governing process server conduct, and based upon a finding that he failed to demonstrate the integrity and honesty necessary to hold a process server license.

97. The DCA also initiated disciplinary proceedings against Benjamin S. Lamb, the process server who served named Plaintiff Jorge Viruet, resulting in a consent order entered in September 2012.

98. Only *six percent* of consumers sued by Pressler in the New York City Civil Courts in 2007 appeared in court to defend themselves.

99. Only *eight-and-a-half percent* of consumers sued in the New York City Civil Courts in 2007 regarding debts allegedly owed to Palisades Collection appeared in court to defend themselves.

100. On information and belief, consumers sued by the Pressler Defendants at the direction of the Asta Defendants to recover alleged AT&T Wireless debts typically did not appear in court because they were never served with notice of the lawsuit.

101. On information and belief, Defendants knowingly promoted the use of false affidavits of service through the Pressler Defendants' process serving agency payment practices.

102. On information and belief, the Pressler Defendants paid the process serving agencies they retained to serve complaints only for completed service.

103. On information and belief, in the lawsuits brought by the Pressler Defendants at the direction of the Asta Defendants to recover alleged AT&T Wireless debts, many of the affidavits of service prepared by the process serving agencies the Pressler Defendants retained were false.

104. For example, some of the affidavits of service falsely attested that the process server effected "personal service" on the defendant at an address where that person did not live at that time, or never lived.

105. Other affidavits of service attested that the process server served the defendant at an accurate address but by "substitute service" on a fictitious person, such as a non-existent relative.

106. Other affidavits of service reported that the process server effected "nail and mail" service on an address where the defendant never lived.

107. On information and belief, Defendants knew that the affidavits of service were highly likely to be false.

108. The vast majority of consumers sued in these lawsuits did not appear in court.

109. When the individuals named in these suits did not appear, Defendants routinely applied for default judgments against them.

110. Defendants routinely applied for default judgments against individuals even when Defendants had reason to believe that service was not properly effected.

111. More than eighty percent of consumer credit cases brought by debt buyers in the New York City Civil Courts in 2006 to 2008 resulted in default judgments for the debt buyers.

112. To obtain a default judgment in New York, a plaintiff must submit (a) proof of service, in the form an affidavit of service; and (b) proof of the "claim, the default, and the amount due by affidavit made by the party." CPLR § 3215(f).

113. Under New York law, debt buyers, like other plaintiffs in civil lawsuits, bear the burden of proof in legal actions. To prevail, the debt buyer must submit admissible evidence demonstrating that it is the rightful owner of the account and that the defendant actually owes the debt in the precise amount claimed. *See, e.g., Citibank v. Martin,* 807 N.Y.S.2d 284 (N.Y. Civ.

Ct. 2005).

114. In debt collection actions, before obtaining a default judgment, the plaintiff also must submit an affidavit that additional notice has been mailed to the defendant by or on behalf of plaintiff at least twenty days prior to the plaintiffs application for a default judgment. CPLR § 3215(g)(3).

115. The plaintiff also must submit an affidavit "stating whether or not the defendant is in military service and showing necessary facts to support the affidavit." 50 U.S.C. App. § 521(b)(1).

116. Where a claim is for a sum certain, as in debt collection suits, the Civil Court clerk "upon submission of the requisite proof, shall enter judgment for the amount demanded in the complaint ... plus costs and interest." CPLR § 3215(a). No judge reviews the application for a default judgment.

117. Each of Defendants' applications for default judgments was supported by an affidavit of service, an "Affidavit of Facts," and an "Affirmation of Non-Military Service."

118. On information and belief, the vast majority of affidavits of service submitted by Defendants in support of their applications for default judgments were fraudulent.

119. On information and belief, Defendants knew that the vast majority of affidavits of service supporting Defendants' applications for default judgment were fraudulent.

120. The Affidavits of Facts that Defendants submitted in support of their applications for default judgment were signed by "Account Specialists" at Palisades Collection, on pain of perjury, and were notarized by individuals who, on information and belief, were other "Account Specialists."

121. In these Affidavits of Facts, the Account Specialists swore that they had "personal knowledge of the facts & circumstances surrounding" the action, including that the defendant had entered an agreement with AT&T Wireless; that the defendant had provided AT&T Wireless with his or her date of birth, address, and social security number; that AT&T had mailed a credit agreement to the defendant; that the defendant had utilized the credit account, made "minimal payments" to the account, defaulted on the account, received statements from AT&T Wireless, and did not object to the last statement.

122. These Account Specialists did not have personal knowledge of any of those facts.

123. These Account Specialists had no personal knowledge of AT&T Wireless's business practices.

124. These Account Specialists did not have access to documents substantiating some or all of the facts contained in the affidavits at the time they swore to the affidavits.

125. For some of these affidavits, these Account Specialists took no steps whatsoever even to verify that the information was in the stream of data.

126. Because the Affidavits of Facts were not based on personal knowledge, they were inadmissible and insufficient to prove the claims on which Defendants sought default judgments.

127. On information and belief, Defendants knew at the time they filed the Affidavits of Facts that the affidavits were inadmissible and insufficient to prove the claims on which Defendants sought default judgments.

128. Courts repeatedly have found that similar affidavits by Palisades Collection Account Specialists are inadmissible and cannot prove Palisades Collection's claims for consumer debts. *See, e.g., Palisades Collection v. Haque,* No. 64374/05, 2006 N.Y. Misc. LEXIS 4036 (N.Y. Civ. Ct. Apr. 13, 2006) (affidavits supposedly establishing that defendant owed Palisades Collection on AT&T Wireless debt inadmissible/insufficient); *Palisades Collection v. Gonzalez,* 809 N.Y.S.2d 482 (N.Y. Civ. Ct. 2005) (same); *Palisades Collection v. Kedik,* 890 N.Y.S.2d 230 (N.Y. App. Div. 2009) (affidavit Palisades Collection submitted to prove standing was inadmissible/insufficient); *Palisades Collection v. Kalal,* 324 Wis. 2d 180 (Wis.

Ct. App. 2010) (Affidavit of Marie Oliphant-the same "account specialist" who signed affidavit supporting default judgment against Named Plaintiff Charles Roberts-was insufficient to establish Chase credit card debt because she had no personal knowledge).

129. The Affirmations of Non-Military Service affirmed that a Pressler attorney accessed the Department of Defense Manpower Data Center over the internet and verified that the individual against whom judgment was sought was not in active military service.

130. The materials supporting Defendants' applications for default judgments in these cases were legally insufficient.

131. On information and belief, Defendants knew that, if the individuals named in these suits did appear in court to defend the actions, Defendants could not prove their claims against those individuals.

132. On information and belief, Defendants also knew that they would not be able to establish that the alleged AT&T accounts were properly assigned to Palisades Collection.

133. On the basis of Defendants' applications for default judgments, the court entered judgments in favor of Palisades Collection.

134. To obtain each fraudulent default judgment, each of the Defendants repeatedly used, and caused to be used, the mails and wires, or reasonably knew that the mails and wires would be used.


### *Defendants Used and Continue To Use Improperly Obtained Default Judgments To Seize Consumers' Assets*

135. Once a plaintiff obtains a default judgment against a person, it may enforce the judgment by, among other things, restraining and executing on the person's bank account, garnishing the person's wages, or seizing the person's personal property. *See, e.g.,* CPLR §§ 5222, 5231, 5232. A plaintiffs attorney may institute these proceedings directly "as officers of the court," without any judicial intervention or scrutiny.

136. After obtaining default judgments against consumers, Defendants routinely take actions to enforce the judgments, including by garnishing the individuals' wages, restraining and executing on their bank accounts, and placing liens on their homes and other assets.

137. Defendants also attempt to collect the default judgments by providing information about the judgments to credit reporting agencies.

138. Defendants take these enforcement and reporting actions with knowledge that the default judgments were obtained on the basis of insufficient proof.

139. Defendants have engaged in these enforcement and reporting actions continuously to the present day.

140. Judgments obtained in New York are enforceable for twenty years, CPLR § 211 (b), so Defendants will continue to execute on the improperly obtained defaults judgments for many years to come.

141. Defendants take insufficient care in targeting individuals for enforcement or reporting of default judgments.

142. Defendants often take action to enforce or report improperly obtained default judgments on the wrong individuals. For example, Defendants take action to enforce or report improperly obtained default judgments on individuals with names different than (though similar to) those against whom the judgments were obtained, and against individuals with social security numbers and dates of birth different than those against whom the judgments were obtained.

143. To enforce each fraudulent default judgment, Defendants repeatedly use, and cause to be used, the mails and wires, or reasonably know that the mails and wires will be used.

***Defendants Aggressively Fight Consumers Seeking To Vacate Improperly Obtained Default Judgments***

144. Many individuals against whom Defendants obtain default judgments in connection with AT&T Wireless debts only learned or will learn about the judgments against them after Defendants garnish their wages or restrain their bank accounts, or after the judgments appear on their credit histories.

145. Some of these individuals have filed orders to show cause to vacate the default judgments.

146. Virtually all such individuals are unrepresented by counsel.

147. Defendants routinely oppose these individuals' orders to show cause, including by filing Affirmations in Opposition to Orders to Show Cause signed by Defendant Zipkin, despite knowledge that the default judgments were obtained on the basis of insufficient proof.

148. When individuals do not succeed in having the court vacate the default judgments against them, Defendants routinely take action to collect on the improperly obtained default judgments.

149. When individuals succeed in having the court vacate the default judgments against them, Defendants routinely fail to return garnished funds and seized assets in violation of court orders.

150. Once individuals have had their judgments vacated, Defendants routinely serve on them notices to admit and interrogatories regarding the underlying accounts.

151. Many of these notices to admit and interrogatories are signed by Defendant Zipkin.

152. If an individual fails to timely answer the interrogatories, the Pressler Defendants, including Defendant Zipkin, routinely move to strike the individual's answer. If that motion is granted, the individual again is in default.

153. The notices to admit and interrogatories are legally improper. Among other improprieties, the notices to admit improperly seek to elicit admissions of facts known or reasonably known to be in dispute, and the interrogatories are overbroad, unduly burdensome, and seek discovery on irrelevant topics.

154. On information and belief, Defendants file these notices to admit and interrogatories for the purpose of harassing, abusing, and oppressing the individuals and to cause the individuals to default.

155. If an individual insists on proceeding to a trial against Palisades, Defendants' practice is either to admit to the court that they are not prepared to proceed to trial, or to propose a stipulation of discontinuance to the individuals.

156. Defendants do not go to trial in these cases because they know that they do not possess and would not be able or willing to obtain the information necessary to prove their claims.

157. Defendants, including Defendant Zipkin, routinely pressure individuals into entering settlements in cases in which Defendants know that they could not prove that the individual owes a debt to Palisades Collection.

158. Some of these settlement agreements require the individuals to pay money to Palisades Collection.

159. Some of these settlement agreements contain releases designed to insulate Defendants from legal accountability for their unlawful actions.

160. To fight consumers seeking to vacate improperly obtained default judgments, Defendants repeatedly use, and cause to be used, the mails and wires, or reasonably know that the mails and wires will be used.

161. The individuals that Defendants sued over AT&T Wireless debts have suffered and will suffer substantial harm, including, but not limited to, costs incurred in connection with litigating the actions; costs associated with improper enforcement actions; monies extracted to satisfy improperly obtained default judgments; damage to credit history; and emotional and psychological harm.

### *CLASS ACTION ALLEGATIONS*

162. Named Plaintiffs bring this action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class consisting of:

> All individuals who have been or will be sued in New York City by Pressler as counsel for Palisades Collection and/or Asta to collect alleged AT&T Wireless debts.

163. The class is so numerous that joinder of all class members in this action would be impracticable; upon information and belief, there are thousands of persons in the class.

164. In 2005, 2006, and 2007 alone, Pressler filed over nearly 60,000 cases in the New York City Civil Courts on behalf of Palisades Collection.

165. Defendants have acted and continue to act on grounds generally applicable to each member of the plaintiff class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

166. Class members present common questions of law and fact and these questions predominate over any individual questions.

167. The common questions of law include, but are not limited to: whether Defendants' practices in initiating legal proceedings, applying for default judgments, and collecting and attempting to collect on such judgments violate the FDCPA, RICO, the New York General Business Law, and the New York Judiciary Law.

168. The common questions of fact include, but are not limited to: whether Defendants filed suits against Plaintiffs without any verifiable basis for each claim, without undertaking a meaningful review of each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; whether Defendants falsely verified complaints; whether Defendants filed or caused to be filed false affidavits in support of applications for default judgments; and whether Defendants engaged in harassing, oppressive, and abusive litigation conduct.

169. The claims of the named Plaintiffs are typical of the claims of the class. Defendants have sued each of the named Plaintiffs based on falsely verified complaints and sought judgments on the basis of false affidavits, and each named Plaintiff has suffered from harassing and oppressive litigation conduct.

170. Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any member of the proposed class.

171. Named Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG") and the law firm Hughes Hubbard & Reed LLP ("HHR"). Attorneys at both NYLAG and HHR are experienced in complex federal litigation and class action litigation.

172. A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the class and a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the class as a whole.

173. Moreover, it would be impracticable for potential plaintiffs, who are primarily low-income individuals with limited access to counsel, to obtain legal services on an individual basis for their claims. Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

### FACTS CONCERNING NAMED PLAINTIFFS

*BETTY BERNHART*

174. Plaintiff Betty Bernhart is a forty-eight year-old woman who currently lives at 30 Centre Mall #1C, Brooklyn, New York. She currently works as a housekeeper at an assisted living facility in Westbury, New York. She worked as a clerk for a medical billing and consulting company until late 2011.

175. In approximately July 2011, Ms. Bernhart's boss received an order directing him to withhold Ms. Bernhart's wages to satisfy a judgment from Palisades Collection. Ms. Bernhart had never heard of Palisades Collection.

176. Although Ms. Bernhart did not know this at the time, Defendants had filed a lawsuit against her on behalf of Palisades Collection on or around January 6, 2006 (the "2006 Lawsuit").

177. On the same day that Defendants sued Ms. Bernhart, they sued more than 200 other individuals in the Bronx alone.

178. The attorney-verified complaint alleged "[u]pon information and belief" that Ms. Bernhart had entered "a Goods and/or Services Contract ... with plaintiff *[i.e.* Palisades Collection]" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Ms. Bernhart; and that, "upon information and belief," Ms. Bernhart owed $1,878.14 on the account. The complaint also pleaded, *not* on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to" Ms. Bernhart. The complaint further alleged that Palisades Collection was "owner of" the account.

179. The complaint stated: "This communication is from a debt collector."

180. Defendant Gulko verified the complaint on December 27, 2005, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Gulko was "in possession of the salient papers in connection with the action."

181. On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants allegedly concerning Ms. Bernhart's purported account.

182. On information and belief, Defendant Gulko did not review Ms. Bernhart's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

183. On information and belief, Defendant Gulko did not have access to those alleged documents at the time he verified the complaint.

184. On information and belief, Defendant Gulko's verification that he was "in possession of the salient papers in connection with the action" was false.

185. On information and belief, at the time Defendant Gulko verified that AT&T Wireless mailed monthly statements to Ms. Bernhart, he did not know whether the statement was true.

186. On information and belief, Defendants did not conduct a meaningful review of Ms. Bernhart's alleged account before filing the complaint.

187. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history connected with Ms. Bernhart's alleged account during the course of the litigation.

188. On information and belief, Defendants knew at the time they filed the complaint that they lacked admissible evidence sufficient to prove the claims stated therein.

189. In fact, Ms. Bernhart never opened an AT&T Wireless account.

190. Defendants retained a process service company called Executive Attorney Service to serve the summons and complaint on Ms. Bernhart.

191. On information and belief, Defendants' arrangement with Executive Attorney Service was that Defendants would pay only for completed service of process.

192. On May 1, 2006, Robert Winckelman, a process server for Executive Attorney Service, swore before a notary that on April 29, 2006, he served the Summons and Verified Complaint on a "[M]s. Bernhart," at 1652 Popham Avenue, MV5D, Bronx, New York, and that on May 1, 2006, he mailed a copy of those documents to that address. Mr. Winckelman described "[M]s. Bernhart" as a black female between thirty-six and fifty years-old.

193. Mr. Winckelman further attested that "[M]s. Bernhart" verified that she was neither in the military nor a dependent of a person in the military.

194. Mr. Winckelman executed an identical "amended" affidavit on January 4, 2007.

195. Ms. Bernhart did not then reside, nor has she ever resided, at 1652 Popham Avenue, in the Bronx.

196. Ms. Bernhart is a white female. She has never resided with anyone else named "Ms. Bernhart."

197. In fact, Ms. Bernhart was never served with process by any method.

198. On or around January 8, 2007, the Pressler Defendants filed the January 4, 2007 affidavit with the court, or caused it to be filed with the court.

199. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

200. In June 2007, Defendants sought a default judgment against Ms. Bernhart.

201. The application for a default judgment was signed by Defendant Franklin on June 7, 2007.

202. The application stated that Defendant Franklin mailed a copy of the summons and complaint to Ms. Bernhart at 1652 Popham Avenue, MV5D, on August 15, 2006.

203. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

204. The Affidavit of Facts was signed by Cherie Thomas, an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized on May 29, 2007.

205. In the Affidavit of Facts, Ms. Thomas swore that she had "personal knowledge of the facts & circumstances surrounding this action."

206. Specifically, Ms. Thomas swore that Ms. Bernhart entered into an agreement with AT&T Wireless; that Ms. Bernhart

had provided AT&T Wireless with her date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Ms. Bernhart "at [Ms. Bernhart's] request"; that Ms. Bernhart utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; that AT&T Wireless mailed the last statement on September 9, 2002; and that Ms. Bernhart did not object to that statement.

207. On information and belief, Ms. Thomas did not have personal knowledge of any of those facts.

208. On information and belief, Ms. Thomas had no personal knowledge of AT&T Wireless's business practices.

209. On information and belief, Ms. Thomas did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

210. On information and belief, the Affidavit of Facts was inadmissible and insufficient to prove the claim against Ms. Bernhart on which Defendants sought a default judgment.

211. The Affirmation of Non-Military Service was signed by Defendant Franklin on June 7, 2007. Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center on June 6, 2007, which showed that Ms. Bernhart was not in the military, and attached a record of an inquiry made over the internet on that date.

212. Defendant Franklin also signed and filed an "Affirmation of Good Faith" stating that Defendants discovered the Popham Avenue address after the case was commenced and served Ms. Bernhart at that address.

213. On June 21, 2007, the court entered a default judgment against Ms. Bernhart, in reliance on the fraudulent affidavit of service, fraudulent Affidavit of Facts, and Affirmation of Non-Military Service.

214. Ms. Bernhart never knew of this judgment until her employer received an income execution order in July 2011.

215. After learning of the income execution order, Ms. Bernhart contacted Palisades Collection. The woman to whom she spoke told her she had been sued; advised her to go to court if she wished to get the judgment vacated; and told her to provide documents showing the judgment had been vacated in order to get the income execution order lifted.

216. On July 27, 2011, Defendants caused a City Marshal to mail to Ms. Bernhart a Notice of Garnishment.

217. On August 3, 2011, Ms. Bernhart, acting pro se, filed an order to show cause seeking to vacate the default judgment. In support of her order to show cause, Ms. Bernhart stated that she did not owe the debt claimed and was the victim of identity theft.

218. Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on August 9, 2011. The accompanying Affirmation of Service by Mail stated that the affirmation was mailed to Ms. Bernhart on August 9, 2011.

219. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

220. The Affirmation in Opposition re-attached the fraudulent affidavit of service.

221. The Affirmation in Opposition attached notices Defendant Zipkin claimed were mailed to Ms. Bernhart at the Popham Avenue address and at 2117 Haviland Avenue, Bronx, New York, at which Ms. Bernhart also never resided, on July 20, 2007; March 18, 2010; and May 12, 2011.

222. On information and belief, Defendant Zipkin did not review Ms. Bernhart's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

223. On information and belief, Defendant Zipkin did not have access to those alleged documents at the time he signed the Affirmation in Opposition.

224. The court vacated the judgment on August 19, 2011.

225. As instructed, Ms. Bernhart provided the court's order to Palisades Collection.

226. At Ms. Bernhart's trial date on September 27, 2011, the attorney appearing for Pressler spoke to Ms. Bernhart, who was unrepresented. The attorney told Ms. Bernhart that Pressler's client had decided to drop the case, and that Ms. Bernhart simply needed to sign a form. The attorney did not explain the form to Ms. Bernhart. The attorney presented a Stipulation Discontinuing Action with mutual releases, which Ms. Bernhart signed.

227. The 2006 Lawsuit against Ms. Bernhart was discontinued with prejudice on September 27, 2011.

228. Around that time, Ms. Bernhart continued to receive notices that her wages were being garnished. Confused, Ms. Bernhart contacted Palisades Collection again, and was informed that Palisades Collection had also obtained *a second default judgment against her.*

229. Defendants had actually filed *two* lawsuits against Ms. Bernhart. The other lawsuit had been filed on or around October 14, 2005 (the "2005 Lawsuit").

230. On the same day that Defendants sued Ms. Bernhart in the 2005 Lawsuit, they sued approximately 150 other individuals in the Bronx alone.

231. The attorney-verified complaint alleged, solely "[u]pon information and belief," that Ms. Bernhart had entered a "Goods and/or Services Contract ... with [Palisades Collection]" on an unspecified date; that "[u]pon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Ms. Bernhart; and that, "[u]pon information and belief," Ms. Bernhart owed $2,042.20 plus interest of $521.73, for a total of $2,563.93 on the account.

232. The complaint further alleged that Palisades Collection was "owner of" the account.

233. The complaint also pleaded, *not* on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to Ms. Bernhart."

234. The complaint stated: "This communication is from a debt collector."

235. Defendant Gulko verified the complaint on September 15, 2005, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Gulko was "in possession of the salient papers in connection with the action."

236. On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants allegedly regarding Ms. Bernhart's purported account.

237. On information and belief, Defendant Gulko did not review Ms. Bernhart's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

238. On information and belief, Defendant Gulko did not have access to those alleged documents at the time he verified the complaint.

239. On information and belief, Defendant Gulko's verification that he was "in possession of the salient papers in connection with the action" was false.

240. On information and belief, at the time Defendant Gulko verified that AT&T Wireless mailed monthly statements to Ms. Bernhart, he did not know and could not have known whether the statement was true.

241. On information and belief, Defendants did not conduct a meaningful review of Ms. Bernhart's alleged account before filing the complaint.

242. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history connected with Ms. Bernhart's alleged account during the course of the litigation.

243. On information and belief, Defendants knew at the time they filed the complaint that they lacked and would lack admissible evidence necessary to be able to prove the claims stated therein.

244. Defendants retained a process service company called Interboro Attorney Service Corporation to serve the summons and complaint on Ms. Bernhart.

245. On information and belief, Defendants' arrangement with Executive Attorney Service was that Defendants would pay only for completed service of process.

246. On December 8, 2005, Howard Kwastel, a process server for Interboro, swore before a notary that on December 1, 2005, he served the Summons and Verified Complaint on Ms. Bernhart by nail and mail service by affixing a copy to the door of 1652 Popham Avenue, #5D, Bronx, New York on November 30, 2005, and mailing a copy to that address on December 5, 2005.

247. Mr. Kwastel further attested that he confirmed with a "neighbor," "Ms. Jefferson," that Ms. Bernhart was not in active military service.

248. Ms. Bernhart did not then reside, nor has she ever resided, at 1652 Popham Avenue, in the Bronx. She does not know any "Ms. Jefferson," so such person, if she existed, would not have been able to identify Ms. Bernhart's military status.

249. In fact, Ms. Bernhart was never served with process for the 2005 Lawsuit by any method.

250. On or around December 9, 2005, Defendants filed this fraudulent affidavit of service with the court, or caused it to be filed with the court.

251. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

252. In July 2006, Defendants sought a default judgment against Ms. Bernhart in the 2005 Lawsuit.

253. The application for a default judgment was signed by Defendant Franklin on July 24, 2006.

254. The application stated that Defendant Franklin mailed a copy of the summons and complaint to Ms. Bernhart at 1652 Popham Avenue, Apt. 5D, on December 15, 2005.

255. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

256. The Affidavit of Facts was signed by Camille Kitson, an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized on March 29, 2006.

257. In the Affidavit of Facts, Ms. Kitson swore that Ms. Bernhart entered into an agreement with AT&T Wireless; that Ms. Bernhart had provided AT&T Wireless with her date of birth, address, and social security number; that AT&T Wireless

mailed a credit agreement to Ms. Bernhart "at [Ms. Bernhart's] request"; that Ms. Bernhart utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; that AT&T Wireless mailed the last statement on November 12, 2002; and that Ms. Bernhart did not object to that statement.

258. On information and belief, Ms. Kitson did not have personal knowledge of any of those facts.

259. On information and belief, Ms. Kitson had no personal knowledge of AT&T Wireless's business practices.

260. On information and belief, Ms. Kitson did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

261. The Affidavit of Facts was inadmissible and insufficient to prove the claim against Ms. Bernhart on which Defendants sought a default judgment.

262. The Affirmation of Non-Military Service was signed by Defendant Franklin on July 24, 2006. Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center on July 21, 2006, which showed that Ms. Bernhart was not in the military, and attached a record of an inquiry made over the internet on that date.

263. Defendant Franklin also signed and filed an "Affirmation of Good Faith" dated July 21, 2006, stating that Defendants discovered a new address for Ms. Bernhart, 1541 White Plains Road, Apt. 1, Bronx, New York, after the case was commenced. Defendant Franklin stated that a copy of the summons and complaint was mailed to that address on December 19, 2005.

264. Ms. Bernhart did not then reside, nor has she ever resided, at 1541 White Plains Road, Apt. 1, Bronx, New York.

265. On August 31, 2006, the court entered a default judgment against Ms. Bernhart, in reliance on the fraudulent affidavit of service, fraudulent Affidavit of Facts, and the Affirmation of Non-Military Service.

266. On September 7, 2011, Defendants caused a City Marshal to send a Notice of Income Execution to Ms. Bernhart's employer. The Notice does not specify the index number of the judgment it seeks to satisfy.

267. Unbeknownst to Ms. Bernhart, Defendants garnished her wages on two occasions, totaling $50.54, in October 2011 to satisfy the judgment in the 2005 Lawsuit.

268. On November 21, 2011, Defendants sent another notice to Ms. Bernhart.

269. On December 12, 2011, Defendants sent an Information Subpoena to Ms. Bernhart.

270. On December 20, 2011, Ms. Bernhart, again acting pro se, filed an order to show cause to vacate the judgment in the 2005 Lawsuit.

271. Defendants again opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on December 28, 2011. The accompanying Affirmation of Service by Mail stated that the Affirmation was mailed to Ms. Bernhart on December 28, 2011.

272. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

273. The Affirmation in Opposition re-attached the fraudulent affidavit of service and stated that Ms. Bernhart's denial of having been served was insufficient.

274. The Affirmation in Opposition attached notices Defendant Zipkin claimed were mailed to Ms. Bernhart at the Popham Avenue address and 2117 Haviland Avenue, Bronx, New York, at which Ms. Bernhart also never resided, on September 6, 2006; November 28, 2008; and January 30, 2009.

275. On information and belief, Defendant Zipkin did not review Ms. Bernhart's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

276. On information and belief, Defendant Zipkin did not have access to those alleged documents at the time he verified the complaint.

277. The court vacated the judgment on January 3, 2012. Ms. Bernhart's answer was deemed filed that day.

278. The order vacating the judgment directed: "Any liens, levies, restraints or executions issued by plaintiff against any property or bank accounts of the defendant shall be vacated forthwith. Any funds, including fees, in the possession of the plaintiff, City Marshal[] or any other agent shall be returned to defendant forthwith."

279. On March 13, 2012, Defendants served Ms. Bernhart with Interrogatories and Notices to Admit Truth of Facts. The Notices to Admit Truth of Facts sought admissions from Ms. Bernhart that she applied for an account with AT&T Wireless, was provided services, utilized the account, received statements on the account, promised to pay the charges on the account, did not contest the charges, defaulted on the account, and agreed that the amount sought was accurate.

280. The Notices to Admit Truth of Facts and Interrogatories were improper and had the effect of harassing, oppressing, and abusing Ms. Bernhart.

281. Ms. Bernhart responded to the Notices to Admit Truth of Facts and Interrogatories on March 29, 2012.

282. On April 12, 2012, less than two weeks before Ms. Bernhart's scheduled trial date, Defendants served her with "Supplemental Interrogatories."

283. The Supplemental Interrogatories were improper and had the effect of harassing, oppressing, and abusing Ms. Bernhart.

284. When Ms. Bernhart appeared for trial on April 25, 2012, Defendants pressured her to sign a Stipulation of Discontinuing Action with mutual releases. Advised by volunteer counsel, Ms. Bernhart refused. Defendants then admitted to the court that they were not prepared to proceed to trial. The court dismissed the 2005 Lawsuit with prejudice.

285. Although the judgment against Ms. Bernhart was vacated on January 3, 2012, Defendants did not return Ms. Bernhart's garnished money until approximately one year later, in January 2013.

286. To have these two improper lawsuits dismissed, Ms. Bernhart was required to appear in court on at least four occasions over the course often months. She also had to go to the courthouse to seek legal assistance and file documents. She missed work on each occasion, causing her to lose income.

287. Ms. Bernhart also suffered stress and emotional distress because of the lawsuits.


## FAUSTO BRITO

288. Plaintiff Fausto Brito was born in the Dominican Republic. He has lived with his wife and his two children at 611 East 149th Street, Bronx, New York since 2002. Mr. Brito works as a truck driver, driving the night shift. He is primarily Spanish-speaking.

289. In early 2012, Mr. Brito sought to qualify for a loan to purchase a home for his family. The bank to which he applied for a mortgage informed him that it could not provide him a mortgage because of an outstanding judgment or judgments against him.

290. After making several inquiries, Mr. Brito went to the Bronx Civil Court, where he learned that there was a judgment

against him resulting from a lawsuit brought by Palisades Collection.

291. This was the first Mr. Brito had ever heard about any supposed debt to Palisades Collection.

292. Although Mr. Brito did not know this at the time, Defendants had filed a lawsuit against him on behalf of Palisades Collection on or around May 24, 2006.

293. On the same day Defendants sued Mr. Brito, they sued over 100 other individuals in the Bronx alone.

294. The attorney-verified complaint alleged "[u]pon information and belief" that Mr. Brito had entered a "Goods and/or Services Contract ... with [Palisades Collection] and/or AT&T WIRELESS" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Mr. Brito; and that, "upon information and belief," Mr. Brito owed $1,188.24 plus interest of $296.81, for a total of $1,485.05, on the account. The complaint also pleaded, not on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to" Mr. Brito. The complaint further alleged that Palisades Collection was "owner of" the account.

295. The complaint stated: "This communication is from a debt collector."

296. Defendant Franklin verified the complaint on April 27, 2006, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Franklin was "in possession of the salient papers in connection with the action."

297. On information and belief, the Pressler Defendants prepared this complaint based only on information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants, allegedly concerning Mr. Brito's purported account.

298. On information and belief, Defendant Franklin did not review Mr. Brito's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

299. On information and belief, Defendant Franklin did not have access to those alleged documents at the time he verified the complaint.

300. On information and belief, Defendant Franklin's verification that he was "in possession of the salient papers in connection with the action" was false.

301. On information and belief, at the time Defendant Franklin verified that AT&T Wireless mailed monthly statements to Mr. Brito, he did not know and could not have known whether the statement was true.

302. On information and belief, Defendant Franklin did not review the alleged contract specifying the rate of interest before verifying the complaint's claim for interest on Mr. Brito's alleged account. Accordingly, Defendant Franklin did not know if the interest was expressly authorized by the alleged contract.

303. On information and belief, Defendants did not conduct a meaningful review of Mr. Brito's alleged account before filing the complaint.

304. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history connected with Mr. Brito's alleged account during the course of the litigation.

305. On information and belief, Defendants knew at the time they filed the complaint that they lacked and would lack admissible evidence sufficient to prove the claims stated therein.

306. In fact, Mr. Brito had never opened an AT&T Wireless account prior to 2006 when the suit was filed.

307. Defendants retained a process service company called AAA Attorney Service Co. of NY, Inc. ("AAA") to serve the summons and complaint on Mr. Brito.

308. On information and belief, Defendants' arrangement with AAA was that Defendants would pay only for completed service of process.

309. On May 31, 2006, Jonah Dawkins, a process server for AAA, swore before a notary that he had attempted to serve Mr. Brito on May 23, 2006, May 26, 2006, and May 29, 2006, at 2907 Kingsbridge Terrace, Apartment 34B, Bronx, New York.

310. Mr. Brito did not then reside, nor has he ever resided, at 2907 Kingsbridge Terrace, Apartment 34B, nor has anyone in his family ever resided there.

311. Mr. Dawkins further attested that he spoke to "Andel Deleon," who was allegedly Mr. Brito's neighbor, and who allegedly confirmed that Mr. Brito resided at that apartment and that Mr. Brito was not in the military.

312. Mr. Dawkins further attested that he served Mr. Brito by nail and mail service by affixing service to the door of 2907 Kingsbridge Terrace, Apartment 34B, on May 29, 2006, and mailing it to him at that address on May 31, 2006.

313. Mr. Brito has never heard of "Andel Deleon," if that person even exists, so Mr. Deleon could not have known where Mr. Brito lived or his military status.

314. In fact, Mr. Brito was never served with process by any method.

315. On or around June 1, 2006, Defendants filed or caused to be filed this fraudulent affidavit of service with the court.

316. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

317. In October 2006, Defendants sought a default judgment against Mr. Brito.

318. The application for a default judgment was signed by Defendant Franklin on October 16, 2006.

319. The application stated that Defendant Franklin mailed a copy of the summons to Mr. Brito at 2907 Kingsbridge Terrace, Apt. 34B, on June 8, 2006.

320. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

321. The Affidavit of Facts was signed by Katrina Robinson, an "Account Specialist" at Palisades Collection, on pain of perjury, on August 8, 2006, and was notarized.

322. In the Affidavit of Facts, Ms. Robinson swore that she had "personal knowledge of the facts & circumstances surrounding this action."

323. Specifically, Ms. Robinson swore that Mr. Brito entered into an agreement with AT&T Wireless; that Mr. Brito had provided AT&T Wireless with his date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Mr. Brito "at [Mr. Brito's] request"; that Mr. Brito utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; that AT&T Wireless mailed the last statement on July 16, 2003; and that Mr. Brito did not object to that statement.

324. On information and belief, Ms. Robinson did not have personal knowledge of any of those facts.

325. On information and belief, Ms. Robinson had no personal knowledge of AT&T Wireless' business practices.

326. On information and belief, Ms. Robinson did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

327. The Affidavit of Facts was inadmissible and insufficient to prove the claim against Mr. Brito on which Defendants sought a default judgment.

328. The Affirmation of Non-Military Service was signed by Defendant Franklin on October 16, 2006. Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center on October 13, 2006, which showed that Mr. Brito was not in the military, and attached a record of an inquiry made over the Internet on that date.

329. On December 5, 2006, the court entered a default judgment against Mr. Brito, in reliance on the fraudulent affidavit of service, the fraudulent Affidavit of Facts, and the Affirmation of Non-Military Service.

330. Mr. Brito never knew of this judgment until the bank processed his loan application in May 2012.

331. In July 2012, Mr. Brito, acting pro se, filed an order to show cause seeking to vacate the default judgment on the ground that he was never served.

332. Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Mitchell Zipkin on July 26, 2012. The accompanying Affirmation of Service by Mail stated that the Affirmation was mailed to Mr. Brito on July 26, 2012.

333. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

334. The Affirmation in Opposition re-attached the fraudulent affidavit of service and stated that Mr. Brito's denial of having been served was insufficient.

335. The Affirmation in Opposition also attached notices Defendant Zipkin claimed were mailed to Mr. Brito at the service address-where he never resided-on June 15, 2006, December 15, 2006; July 18, 2008; October 29, 2009; January 31, 2011; and March 1, 2012.

336. The Affirmation in Opposition also attached a notice mailed to Mr. Brito at 2865 Kingsbridge Terrace, Apartment 9G, on May 1, 2012. Mr. Brito never resided at that address either.

337. On information and belief, Defendant Zipkin did not review Mr. Brito's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

338. On information and belief, Defendant Zipkin did not have access to those documents at the time he signed the Affirmation in Opposition.

339. The court vacated the judgment on July 31, 2012.

340. On that day, Mr. Brito filed an Answer stating that he denied the allegations in the Complaint, that he was never served with process, that he did not owe or incur the debt, that he disputed the debt, and that Palisades Collection lacked standing, among other things.

341. Also that day, Mr. Brito, with the assistance of a volunteer attorney, served Defendants with a discovery request, seeking a fully-executed application, complete agreement and all amendments, a history of payments and monthly billing statements, proof of assignment of the debt, and a breakdown of all interest and fees Defendants were seeking.

342. The Pressler Defendants received the discovery request, which Mr. Brito sent by certified mail, on August 7, 2012.

343. Defendants did not respond to the discovery request within the twenty days permitted by law or any time thereafter. On information and belief, Defendants did not possess, and could not obtain, the documents Mr. Brito sought in his discovery request.

344. On August 6, 2012, the Pressler Defendants served Mr. Brito with Interrogatories and Notices to Admit Truth of Facts, seeking admissions from Mr. Brito that he applied for an account with AT&T Wireless, was provided services, utilized the account, received statements on the account, promised to pay the charges on the account, did not contest the charges, defaulted on the account, and agreed that the amount sought was accurate.

345. The Interrogatories and Notices to Admit Truth of Facts were improper and had the effect of harassing, oppressing, and abusing Mr. Brito.

346. Mr. Brito did not understand that he was required to answer the Interrogatories and Notices to Admit Truth of Facts.

347. On October 11, 2012, Defendants moved to strike Mr. Brito's Answer on the ground that he had not responded to the Interrogatories. Defendants subsequently withdrew the motion and refiled it on November 19, 2011. If granted, the effect of the motion would have been to put Mr. Brito in default again.

348. On November 27, 2012, the court conditionally granted Defendants' motion but gave Mr. Brito thirty additional days to respond to the Notices to Admit Truth of Facts and Interrogatories. Mr. Brito timely filed responses and so the motion was denied.

349. During the November 27, 2012 court appearance, Mr. Brito and his volunteer attorney for that day's appearance spoke with an attorney appearing for Pressler. The Pressler attorney confirmed that the social security number and address in Defendants' files for this case did not match Mr. Brito's social security number and address, but stated that Pressler would continue to prosecute the action.

350. On December 20, 2012, the Pressler Defendants served Mr. Brito with "Supplemental Interrogatories."

351. The Supplemental Interrogatories were improper, and had the effect of harassing, oppressing, and abusing Mr. Brito.

352. In early February 2013, shortly before Mr. Brito's scheduled trial date, Defendants mailed Mr. Brito a proposed Stipulation of Discontinuing Action with mutual releases, requesting that he sign and return the document. Mr. Brito, then advised by a volunteer attorney, refused to sign the Stipulation.

353. When Mr. Brito appeared for trial on February 19, 2013, this time with a volunteer attorney, Defendants admitted to the court that they were not prepared to proceed to trial. Mr. Brito and his attorney requested that the case be dismissed. Rather than dismiss the case, however, the court adjourned the trial date.

354. On March 11, 2013, Mr. Brito, through counsel, again appeared for trial. After Defendants again admitted to the court that they were not prepared to proceed to trial, the court dismissed the action with prejudice.

355. To have the lawsuit dismissed, Mr. Brito appeared in court on at least five occasions over the course of nine months. He also had to go to the courthouse to seek legal assistance and file documents.

356. Mr. Brito had to miss work to appear in court, resulting in lost income.

357. The lawsuit contributed to Mr. Brito's ineligibility to obtain a loan to purchase a home for his family.

358. Mr. Brito has also suffered stress and emotional distress because of the lawsuit.

*CHARLES ROBERTS*

359. Plaintiff Charles Roberts currently lives at 3660 Waldo Avenue, Apartment 4H, Bronx, New York. In 2006, he lived with his mother, Dolores Roberts, at 115 West 227th Street, Apartment 3C, Bronx, New York. Mr. Roberts is employed by Cogent as a fingerprinter.

360. In or around August 2012, Mr. Roberts discovered that his Chase Bank savings account containing approximately $3,000 had been restrained due to an outstanding judgment owed to Palisades Collection.

361. Prior to August 2012, Mr. Roberts had not heard anything about a supposed judgment owed to Palisades Collection.

362. Although Mr. Roberts did not know this at the time, Defendants had filed a lawsuit against him on behalf of Palisades Collection on or around March 2, 2006.

363. On the same day that Defendants sued Mr. Roberts, they sued approximately fifty other individuals in the Bronx alone.

364. The attorney-verified complaint alleged "[u]pon information and belief" that Mr. Roberts had entered a "Goods and/or Services Contract ... with [Palisades Collection] and/or AT&T WIRELESS" on an unspecified date; that "[u]pon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment, was mailed to Mr. Roberts; and that, "[u]pon information and belief," Mr. Roberts owed $1,325.24 plus interest of $345.10 on the account, for a total of $1,670.34.

365. The complaint also pleaded, not on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to Mr. Roberts."

366. The complaint failed to allege that Palisades Collection was the owner of the AT&T Wireless debt.

367. The complaint stated: "This communication is from a debt collector."

368. Defendant Franklin verified the complaint on February 16, 2006, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Franklin was "in possession of the salient papers in connection with the action."

369. On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants, allegedly concerning Mr. Roberts's purported account.

370. On information and belief, Defendant Franklin did not review Mr. Roberts's alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before verifying the complaint.

371. On information and belief, Mr. Franklin did not have access to those alleged documents at the time he verified the complaint.

372. On information and belief, Defendant Franklin's verification that he was "in possession of the salient papers in connection with the action" was false.

373. On information and belief, at the time Defendant Franklin verified that AT&T Wireless mailed monthly statements to Mr. Roberts, he did not know and could not have known whether the statement was true.

374. On information and belief, Defendant Franklin did not review the alleged contract specifying the rate of interest before verifying the complaint's claim for interest on Mr. Roberts' alleged account. Accordingly, Defendant Franklin did not know if the interest was expressly authorized by the alleged contract.

375. On information and belief, Defendants did not conduct a meaningful review of Mr. Roberts' alleged account before filing the complaint.

376. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history connected with Mr. Roberts' alleged account during the course of the litigation.

377. On information and belief, Defendants knew at the time they filed the complaint that they lacked and would lack admissible evidence sufficient to prove the claims stated therein.

378. In fact, Mr. Roberts did not owe any money to AT&T Wireless.

379. Defendants retained a process service company called AAA Attorney Service Co. of NY, Inc. ("AAA") to serve the summons and complaint on Mr. Roberts.

380. On information and belief, Defendants' arrangement with AAA was that Defendants would pay only for completed service of process.

381. On March 10, 2006, Loai Sarsour, a process server for AAA, swore before a notary that on March 9, 2006, he served the Summons and Verified Complaint on Mr. Roberts by delivering and leaving the documents with "Shirley Roberts, [a] relative of the defendant" at 115 West 227th Street, Apartment 3C, Bronx, New York. Loai Sarsour described Shirley Roberts as a thirty-five-year-old black woman with black hair who was approximately 5′2″ tall.

382. Loai Sarsour further attested that "Shirley Roberts" told him that Mr. Roberts was neither in the military nor a dependent of a person in the military.

383. Loai Sarsour further attested that on March 10, 2006, he mailed a copy of the Summons and Verified Complaint to Mr. Roberts at the same address, 115 West 227th Street, Apartment 3C, Bronx, NY 10463.

384. Although Mr. Roberts did reside at 115 West 227th Street, Apartment 3C in the Bronx at that time, he is not related to and does not know anyone named Shirley Roberts.

385. Although Ms. Roberts' mother also lived at that address, her name is Dolores Roberts. Unlike the woman described by the process server, Dolores Roberts was at the time approximately seventy years old, 5′7″ tall, and had "salt and pepper hair."

386. Mr. Roberts did not receive any papers in the mail from AAA, Palisades Collection, or Pressler.

387. In fact, Mr. Roberts was never served with process by any method.

388. On or around March 13, 2006, Defendants filed this fraudulent affidavit of service with the court or caused it to be filed with the court.

389. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

390. In January 2007, Defendants sought a default judgment against Mr. Roberts.

391. The application for a default judgment was signed by Defendant Franklin on January 17, 2007.

392. The application stated that Defendant Franklin mailed Mr. Roberts a copy of the summons to 115 West 227th St, Apartment 3C, Bronx, New York on March 24, 2006.

393. Mr. Roberts never received this copy of the summons.

394. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

395. The Affidavit of Facts was signed by Judith Stone, an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized on November 29, 2006.

396. In the Affidavit of Facts, Ms. Stone swore that she had "personal knowledge of the facts & circumstances surrounding this action."

397. Specifically, Ms. Stone swore that Mr. Roberts entered into an agreement with AT&T Wireless; that Mr. Roberts had provided AT&T Wireless with his date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Mr. Roberts "at [Mr. Roberts'] request"; that Mr. Roberts utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; that AT&T Wireless mailed the last statement on March 28, 2003; and that Mr. Roberts did not object to that statement.

398. On information and belief, Ms. Stone did not have personal knowledge of any of those facts.

399. On information and belief, Ms. Stone had no personal knowledge of AT&T Wireless's business practices.

400. On information and belief, Ms. Stone did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

401. On information and belief, the Affidavit of Facts was inadmissible and insufficient to prove the claim against Mr. Roberts on which Defendants sought a default judgment.

402. The Affirmation of Non-Military Service was signed by Defendant Franklin on January 17, 2007. Defendant Franklin affirmed that he conducted an investigation with the Department of Defense Manpower Data Center on January 16, 2007, which showed that Mr. Roberts was not in the military, and attached a record of an inquiry made over the internet on that date.

403. On January 30, 2007, the court entered a default judgment against Mr. Roberts, in reliance on the fraudulent affidavit of service, the fraudulent Affidavit of Facts, and the Affirmation of Non-Military Service.

404. Mr. Roberts was unaware of this judgment until his bank account was frozen in approximately August 2012.

405. Although Mr. Roberts was unaware at the time, Defendants also, on information and belief, had reported the judgment to credit reporting agencies.

406. After the bank told him the identity of his creditor, Mr. Roberts called Palisades Collection and explained that he did not owe this debt. In response, Palisades Collection sent him a proposed payment plan in the mail.

407. On August 28, 2012, Mr. Roberts, acting pro se, filed an order to show cause, seeking to vacate the default judgment on grounds that he was never served and did not owe this debt.

408. Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on September 7, 2012. The accompanying Affirmation of Service by Mail stated that the Affirmation in Opposition was mailed to Mr. Roberts on September 7, 2012.

409. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

410. The Affirmation in Opposition re-attached the fraudulent affidavit of service and stated that Mr. Roberts' denial of having been served was insufficient.

411. The Affirmation in Opposition also attached notices Defendant Zipkin claimed were mailed to Mr. Roberts at the service address on February 7, 2007, December 4, 2008, November 9, 2009, February 28, 2011, and August 11, 2011.

Case 1:16-cv-08779-ER    Document 1-3    Filed 11/11/16    Page 27 of 43

Betty BERNHART, Fausto Brito, Charles Roberts, and..., 2013 WL 3939724...

412. Mr. Roberts never received any of these notices.

413. On information and belief, Defendant Zipkin did not review Mr. Roberts' alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

414. On information and belief, Defendant Zipkin did not have access to those documents at the time he signed the Affirmation in Opposition.

415. On September 12, 2012, the court granted Mr. Roberts' motion conditional on the result of a Traverse hearing-that is, a hearing to determine whether service had been made-to be held on November 14, 2012. The court ordered that, if service was found to have been valid, the parties would proceed to trial on the basis of Mr. Roberts' proposed answer, but if service was found to have been improper, the case would be dismissed.

416. On November 14, 2012, a Pressler lawyer appeared for Palisades Collection and, rather than proceed with the hearing, agreed to discontinue the action against Mr. Roberts with prejudice.

417. The Pressler lawyer gave Mr. Roberts a Stipulation of Discontinuing Action to sign, and told him that he had to sign it for the court to dismiss the case. On that representation, Mr. Roberts signed the Stipulation.

418. As a result of this improper lawsuit, Mr. Roberts was denied access to the money in his savings account during the approximately four months that his bank account was restrained. He was unable to pay his bills during this time, and was forced to borrow money from his sister and his girlfriend on several occasions.

419. To have this improper lawsuit dismissed, Mr. Roberts was required to take time off work without pay on numerous occasions to file documents and appear in court on at least three separate occasions.

420. Mr. Roberts has also suffered stress and emotional distress because of the lawsuit.


***JORGE VIRUET***

421. Plaintiff Jorge Viruet is a thirty-four year-old man who currently resides at 1134 E. 165th Street, Bronx, New York. He lives with his girlfriend, with whom he is expecting a child in November 2013. He currently works as an assistant to the area manager at Avant Business Services in Manhattan. He has been employed by Avant for the last three years.

422. In approximately late September or early October 2012, Mr. Viruet's employer received an order directing him to withhold Mr. Viruet's wages to satisfy a judgment on behalf of Palisades Collection against an individual named "Jorge Virueto." Mr. Viruet had never heard of Palisades Collection and had no knowledge of the judgment.

423. Although Mr. Viruet did not know this at the time, Defendants had filed a lawsuit on behalf of Palisades Collection on or around June 19, 2006 against a "Jorge Virueto." Mr. Viruet's last name is not and has never been "Virueto."

424. On the same day that Defendants sued "Jorge Virueto," they sued approximately 100 other individuals in the Bronx alone.

425. The attorney-verified complaint alleged "[u]pon information and belief" that Mr. "Virueto" had entered "a Goods and/or Services Contract ... with plaintiff *[i.e.* Palisades Collection] and/or AT&T WIRELESS" on an unspecified date; that "upon information and belief" an agreement containing the terms and conditions governing the account, including the terms of payment," had been mailed to Mr. "Virueto"; and that, "upon information and belief," Mr. "Virueto" owed $922.46 on the account. The complaint also pleaded, *not* on information and belief, that "Plaintiff and/or AT&T WIRELESS has mailed monthly statements required by the agreement to" Mr. "Virueto." The complaint further alleged that Palisades Collection was "owner of" the account.

426. The complaint stated: "This communication is from a debt collector."

427. Defendant Franklin verified the complaint on June 5, 2006, stating on pain of perjury that the complaint was true, except as to matters pleaded on information and belief, which he believed to be true. The verification also stated that Defendant Franklin was "in possession of the salient papers in connection with the action."

428. On information and belief, the Pressler Defendants prepared this complaint based only on the information contained in the "stream of data" or "media" provided by AT&T Wireless to the Asta Defendants allegedly concerning the account purportedly belonging to Mr. "Virueto."

429. On information and belief, Defendant Franklin did not review the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history pertaining to the account purportedly held by Mr. "Virueto" before verifying the complaint.

430. On information and belief, Defendant Franklin did not have access to those alleged documents at the time he verified the complaint.

431. On information and belief, Defendant Franklin's verification that he was "in possession of the salient papers in connection with the action" was false.

432. On information and belief, at the time Defendant Franklin verified that AT&T Wireless mailed monthly statements to a Mr. "Virueto," he did not know whether the statement was true.

433. On information and belief, Defendants did not conduct a meaningful review of the account purportedly held by Mr. "Virueto" before filing the complaint.

434. On information and belief, Defendants knew at the time they filed the complaint that they did not have, and likely would not be able to obtain, the alleged account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history connected with the account purportedly held by Mr. "Virueto" during the course of the litigation.

435. On information and belief, Defendants knew at the time they filed the complaint that they lacked admissible evidence sufficient to prove the claims stated therein.

436. In fact, Mr. Viruet never opened an AT&T Wireless account.

437. Defendants retained a process service company called Executive Attorney Service to serve the summons and complaint on the Mr. "Virueto" alleged to have incurred the debt.

438. On information and belief, Defendants' arrangement with Executive Attorney Service was that Defendants would pay only for completed service of process.

439. On June 30, 2006, Benjamin Lamb, a process server for Executive Attorney Service, swore before a notary that on June 26, 2006, he served the Summons and Verified Complaint on a "Jorge Virueto" by delivering a copy of the documents to a "Melanie Virusto [sic]" at 539 Coster Street, Apartment 4, Bronx, New York.

440. Benjamin Lamb attested that Melanie Virusto was a "person of suitable age and discretion" and indicated that she was a female with brown skin and brown hair, between 21 and 35 years old. He estimated her height to be between 5′>4″ and 5′8″ and her weight to be between 131 and 160 lbs.

441. Benjamin Lamb further attested that when he asked Ms. Virusto "whether said premises was the Recipient's PLACE OF RESIDENCE," her answer was "affirmative."

442. Benjamin Lamb further attested that he asked "the person spoken to" if Jorge "Virueto" was in active military service and "received a negative reply."

443. Benjamin Lamb further attested that he mailed a copy of the Summons and Verified Complaint to a Mr. "Virueto" at the same address, 539 Coster Street, Apartment 4, Bronx, New York, on June 30, 2006.

444. Mr. Viruet did not then reside, nor has he ever resided, at 539 Coster Street, Apartment 4, in the Bronx.

445. Mr. Viruet's brother lived at 539 Coster Street, Apartment 4, from 1997 until 2000, during which time Mr. Viruet received mail at that address. Mr. Viruet stopped receiving mail at that address when his brother moved to a different address in 2000.

446. At the time of the alleged service of process in June 2006, Mr. Viruet resided at 4366 White Plains Road, Bronx, NY, where he had resided since 2001. Mr. Viruet's brother resided at 1074 Summit Avenue, Apartment 2B, Bronx, NY, where he had resided since 2005.

447. Mr. Viruet does not know who lived at 539 Coster Street, Apartment 4, at the time of the alleged service of process, and he does not know anyone named Melanie Virusto, or Melanie Virueto, or Melanie Viruet.

448. Mr. Viruet did not receive any documents in the mail from Executive Attorney Service, Palisades Collection, or Pressler.

449. In fact, Mr. Viruet was never served with process by any method.

450. Sometime after June 30, 2006, the Pressler Defendants filed the June 30, 2006 Affidavit of Service with the court, or caused it to be filed with the court.

451. On information and belief, Defendants knew that the affidavit of service was highly likely to be false.

452. In November 2006, Defendants sought a default judgment against "Jorge Virueto."

453. Defendant Franklin signed the application for a default judgment on November 22, 2006.

454. The application stated that Defendant Franklin mailed a copy of the summons and complaint to "Jorge Virueto" on July 17, 2006 at 539 Coster Street, Apartment 4, Bronx, NY.

455. In support of their application for a default judgment, Defendants submitted the fraudulent affidavit of service. They also submitted an "Affidavit of Facts" and an "Affirmation of Non-Military Service."

456. The Affidavit of Facts was signed by Cynthia A. Imperato, an "Account Specialist" at Palisades Collection, on pain of perjury, and was notarized on September 12, 2006.

457. In the Affidavit of Facts, Ms. Imperato swore that she had "personal knowledge of the facts & circumstances surrounding this action."

458. Specifically, Ms. Imperato swore that Mr. "Virueto" entered into an agreement with AT&T Wireless; that Mr. "Virueto" had provided AT&T Wireless with his date of birth, address, and social security number; that AT&T Wireless mailed a credit agreement to Mr. "Virueto" "at [Mr. Virueto's] request"; that Mr. "Virueto" utilized the credit account, "made minimal payments on behalf of the account," defaulted on the account, and received statements from AT&T Wireless; that AT&T Wireless mailed the last statement on October 3, 2003; and that Mr. "Virueto" did not object to that statement.

459. On information and belief, Ms. Imperato did not have personal knowledge of any of those facts.

460. On information and belief, Ms. Imperato had no personal knowledge of AT&T Wireless's business practices.

461. On information and belief, Ms. Imperato did not have access to documents substantiating some or all of the facts contained in the affidavit at the time she swore to the affidavit.

462. On information and belief, the Affidavit of Facts was inadmissible and insufficient to prove the claim against Jorge "Virueto" on which Defendants sought a default judgment.

463. The Affirmation of Non-Military Service was signed by Defendant Franklin on November 22, 2006. Defendant Franklin attested that he conducted an investigation with the Department of Defense Manpower Data Center on November 21, 2006, which showed that "Mr. Virueto" was not in the military. Defendant Franklin attached a record of an inquiry made over the internet on that date.

464. On December 12, 2006, the court entered a default judgment against "Mr. Virueto," in reliance on the fraudulent affidavit of service, fraudulent Affidavit of Facts, and Affirmation of Non-Military Service.

465. Mr. Viruet did not learn of this judgment until his employer notified him of the income execution order it had received in September 2012.

466. The payroll department at Mr. Viruet's employer directed Mr. Viruet to speak with the New York City Marshal who had issued the garnishment order. That individual advised Mr. Viruet that he could go to the courthouse to seek to have the judgment vacated.

467. On October 4, 2012, Mr. Viruet, acting pro se, filed an order to show cause, seeking to vacate the default judgment that had been entered against "Jorge Virueto" and that formed the basis of the income execution order being enforced against Mr. Viruet.

468. In support of his order to show cause, Mr. Viruet stated, among other things, that he "never received the court papers," "do[es] not owe the money," and that he was "a victim of identity theft or mistaken identity."

469. Defendants opposed the order to show cause. Their Affirmation in Opposition was signed by Defendant Zipkin on October 11, 2012. The accompanying Affirmation of Service by Mail stated that the affirmation was mailed to "Jorge Virueto" on October 11, 2012.

470. The Affirmation in Opposition stated that Defendant Zipkin was "fully familiar with all the facts and circumstances of this action."

471. The Affirmation in Opposition re-attached the fraudulent affidavit of service.

472. The Affirmation in Opposition attached notices Defendant Zipkin claimed were mailed to "Jorge Virueto" at 1465 Washington Avenue, Apartment 2H, Bronx, New York on December 19, 2006 and February 15, 2008. Mr. Viruet never lived at that address and did not receive these notices.

473. The Affirmation in Opposition also attached a notice Defendant Zipkin claimed was mailed to "Jorge Virueto" at 4366 White Plains Road, Bronx, New York on April 21, 2010. Mr. Viruet did not reside at this address at the time the notices supposedly were mailed and he never received the notices.

474. The Affirmation in Opposition also attached a notice Defendant Zipkin claimed was mailed to "Jorge Virueto" at 257 Wyckoff Avenue, Apartment 1R, Brooklyn, New York on July 28, 2011. Mr. Viruet did not reside at this address at the time the notices supposedly were mailed and he never received the notices.

475. The Affirmation in Opposition also attached a notice Defendant Zipkin claimed was mailed to "Jorge Virueto" at 7101 35th Avenue, Apartment 8, Jackson Heights, New York on October 6, 2011. Although Mr. Viruet did reside at that address at the time the notice purportedly was sent, he did not receive the notice.

476. The Affirmation in Opposition also attached a notice Defendant Zipkin claimed was mailed to "Jorge Virueto" at 1074 Summit Avenue, Apartment 2B, Bronx, New York on September 14, 2012. Mr. Viruet did not reside at this address at the time the notices supposedly were mailed and he never received the notices.

477. On information and belief, Defendant Zipkin did not review the alleged "Jorge Virueto" account agreement, account statements, account application, signed contract, original billing statements, payment records, or dispute history before signing the Affirmation in Opposition.

478. On information and belief, Defendant Zipkin did not have access to those alleged documents at the time he signed the Affirmation in Opposition.

479. After an initial adjournment, the Civil Court of the City of New York denied Mr. Viruet's motion to vacate the judgment on December 20, 2012. The Court's Order stated: "[D]enied as time barred. The judgement [sic] was entered 5 years ago. Defendant admits to living at the same address as well."

480. In fact, Mr. Viruet had not admitted to living at the service address. He stated only that he had used that address as a mailing address six years prior to the alleged service. In addition, his motion was not time-barred because it was based on lack of personal jurisdiction.

481. On January 3, 2013, Mr. Viruet filed a second Order to Show Cause and was instructed to return on January 7, 2013. When he returned on that date, a courthouse employee informed Mr. Viruet that his order to show cause had not been signed by a judge and would not be heard by the court.

482. Following the Court's Order, and on the basis of the default judgment obtained against "Jorge Virueto," Defendants began garnishing Mr. Viruet's wages at the statutory maximum rate of 10%, or approximately $240 per month.

483. As of June 26, 2013, Pressler had garnished $1,200.00 from Mr. Viruet's wages.

484. This erroneous garnishment has caused Mr. Viruet significant financial hardship.

485. In addition, the improper judgment obtained against "Jorge Virueto" appears on Mr. Viruet's credit history.

486. Mr. Viruet was also required to appear in court on at least four occasions over the course of four months to contest the improperly obtained judgment.

487. Mr. Viruet also suffered stress and emotional distress because of the lawsuit and the garnishment.

### FIRST CAUSE OF ACTION

### (FDCPA, 15 U.S.C. § 1692)

488. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 411 above.

489. Defendants are "debt collectors" within the meaning of the FDCPA. 15 U.S.C. § 1692a(6).

490. The FDCPA prohibits "debt collectors" from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt," including making a false representation of "the character, amount, or legal status of any debt," and using deceptive means "to collect or attempt or collect any debt," 15 U.S.C. § 1692e; engaging in "any conduct the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; and using "unfair or unconscionable means" to attempt to collect a debt, including attempting to collect amounts not "expressly authorized by the agreement" creating the debt. 15 U.S.C. § 1692f.

491. Defendants violated the FDCPA, 15 U.S.C. §§ 1692d, 1692e, and 1692 by making false and misleading representations,

using deceptive means, and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to: a. Commencing suits against Plaintiffs without undertaking a meaningful review of each claim;

b. Commencing suits against Plaintiffs without any verifiable basis for each claim and without the ability or intent to obtain the documentation necessary to prove each claim;

c. Falsely verifying complaints;

d. Seeking amounts not expressly authorized by agreement;

e. Filing or causing to be filed false affidavits of service;

f. Filing false Affidavits of Facts in support of applications for default judgments;

g. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments;

h. Taking actions to execute judgments, including garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments;

i. Unlawfully retaining funds obtained through execution of judgments; and

j. Engaging in harassing, oppressive, and abusive litigation conduct.

492. As a direct and proximate result of Defendants' violations, Plaintiffs have sustained actual damages in an amount to be proved at trial and are also entitled to statutory damages, costs, and attorneys' fees.

### SECOND CAUSE OF ACTION

### (Civil RICO, 18 U.S.C. § 1962(c))

493. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 416 above.

494. Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

495. Defendants are corporate entities and natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

#### The Enterprise

496. Asta, Stern, Asta John/Jane Does 1-20, Palisades Collection, Palisades Collection John/Jane Does 1-20, Pressler, Franklin, Gulko, Zipkin, and Pressler John/Jane Does 1-20 together form an association-in-fact and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). Each and every Defendant is associated with the Enterprise.

497. The purpose of the Enterprise is to collect debts that Defendants cannot prove through fraudulently and deceptively filing and pursuing debt collection actions. This is accomplished by Asta and Palisades, at the direction of Stern, buying debts for collection; the Pressler Defendants, at the direction of the Asta Defendants, commencing actions in the New York City Civil Court on behalf of Palisades Collection; and the Pressler Defendants, at the direction of the Asta Defendants, obtaining and enforcing default judgments against Plaintiffs and putative class members through fraudulent means.

498. The relationships among Defendants are longstanding and ongoing. The Asta Defendants began working with the Pressler Defendants in early 2005, if not before, and continue their relationship to this day.

499. For at least eight years the Enterprise has been engaged in, and continues to be engaged in, activities that affect interstate commerce. Defendants' unlawful enterprise in violation of RICO has been and remains longstanding, continuous, and open-ended.

500. Defendant Asta directed the purchase of consumer debts from AT&T Wireless that formed the basis of the Enterprise's fraudulent and deceptive debt collection actions. Asta also developed and oversees the "legal strategy" scheme pursuant to which the Pressler Defendants commenced those fraudulent and deceptive debt collection actions.

501. Defendant Palisades Collection owns the AT&T Wireless consumer debts that form the basis of the fraudulent and deceptive debt collection actions, and, at Asta's direction, commenced those actions by and through the Pressler Defendants. Palisades Collection employees, acting at Palisades Collection's and Asta's direction, also signed fraudulent Affidavits of Facts filed with the New York City Civil Court.

502. Defendant Stern, the President and Chief Executive Officer of Asta and Principal of Palisades Collection, orchestrated, supervised, and monitored the Enterprise's scheme to commence fraudulent and deceptive debt collection actions.

503. Defendant Pressler, at the direction of the Asta Defendants, litigates the fraudulent and deceptive debt collection actions. Pursuant to the Asta Defendants' retainer agreement with Pressler, Pressler was required keep the Asta Defendants apprised of the scheme's progress by providing the Asta Defendants with monthly reports. In addition, the Asta Defendants were permitted to conduct audits of the Pressler Defendants' implementation of the Defendants' litigation strategy.

504. Defendant Franklin, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including verifying fraudulent complaints and signing or affirming other fraudulent filings in New York City Civil Court.

505. Defendant Gulko, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including verifying fraudulent complaints and signing or affirming other fraudulent filings in New York City Civil Court.

506. Defendant Zipkin, an attorney at Pressler at all relevant times, litigates the fraudulent and deceptive debt collection actions, including signing fraudulent Affirmations in Opposition to Orders to Show Cause and other fraudulent filings in New York City Civil Court.


*Pattern of Racketeering Activity*

507. Defendants, individually and as part of the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

508. Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. Each Defendant's participation was critical to the racketeering scheme. They enabled, conducted, and maintained the racketeering scheme by:
a. Filing deceptive complaints that falsely stated that Defendants were "in possession of the salient papers in connection with the action," when in fact they were not in possession of such papers;

b. Filing deceptive complaints that misrepresented that Defendants were in possession of or could obtain documentation evidencing that Plaintiffs and class members owe a debt, when in fact they did not possess and could not obtain such documentation;

c. Filing or causing to be filed fraudulent affidavits of service that falsely claimed that Plaintiffs and class members were served with a summons and complaint when in fact they were not;

d. Producing and filing, in support of applications for default judgments, fraudulent Affidavits of Facts that falsely claimed that Defendants had personal knowledge of the facts necessary to obtain a default judgment, when in fact they did not;

e. Filing or causing to be filed false affidavits of service in support of applications for default judgments;

f. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments; and

g. Using fraudulently obtained default judgments to extract money from Plaintiffs and class members.


509. Specifically, Defendants have made fraudulent misrepresentations on the following occasions:
a. On or around October 14, 2005, January 6, 2006, February 16, 2006, May 24, 2006, and June 5, 2006, Defendants falsely verified complaints stating that they were "in possession of the salient papers in connection with [each] action," when they were not;

b. On or around December 9, 2005, March 13, 2006, June 1, 2006, June 30, 2006, and January 8, 2007, Defendants filed or caused to be filed fraudulent affidavits of service with the Civil Court falsely stating that service had been made, when it was not;

c. In July 2006, October 2006, November 2006, January 2007, and June 2007, Defendants submitted the fraudulent affidavits of service with the Civil Court in support of their applications for default judgment;

d. On or around March 24, 2006, August 8, 2006, September 12, 2006, November 29, 2006, and May 29, 2007, Defendants signed Affidavits of Facts falsely claiming that Defendants had personal knowledge of the facts and circumstances surrounding this action, when in fact they did not.

e. In July 2006, October 2006, November 2006, January 2007, and June 2007, Defendants filed fraudulent Affidavits of Facts with the Civil Court falsely claiming that Defendants had personal knowledge of the facts and circumstances surrounding this action, when in fact they did not; and

f. In August 2011, December 2011, July 2012, September 2012, and October 2012, Defendants filed fraudulent affirmations in opposition to orders to show cause falsely representing that they were "fully familiar with all the facts and circumstances of this action" when they were not, and attaching the fraudulent affidavits of service.


510. Defendants, acting individually and as part of the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme, specifically:
a. Defendant Franklin used the interstate wires to access the Department of Defense Manpower Data on July 21, 2006, according to his Affirmation dated July 24, 2006; on January 16, 2007, according to his Affirmation dated January 17, 2007; on October 13, 2006, according to his Affirmation dated October 16, 2006; on November 21, 2006, according to his Affirmation dated November 22, 2006; on January 16, 2007, according to his Affirmation dated January 17, 2007; and on June 6, 2007, according to his Affirmation dated June 7, 2007;

b. On or about December 5, 2005, Defendants caused a process server to send a copy of the summons and complaint in the 2005 Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, Apartment 5D, Bronx, New York, according to the process server's affidavit dated December 8, 2005;

c. On or about December 15, 2005, Defendant Franklin sent a copy of the summons and complaint in the 2005 Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, Apartment 5D, Bronx, New York, according to Defendant Franklin's application for a default judgment dated July 24, 2006;

d. On or about May 1, 2006, Defendants caused a process server to send a copy of the summons and complaint in the 2006

Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, MV5D, Bronx, New York, according to the process server's affidavit dated May 1, 2006;

e. On or about August 15, 2006, Defendant Franklin sent a copy of the summons and complaint in the 2006 Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, MV5D, Bronx, New York, according to Defendant Franklin's application for default judgment dated June 7, 2007;

f. On or about September 6, 2006, November 28, 2008, and January 30, 2009, the Pressler Defendants sent Judgment Notices related to the 2005 Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, Apartment 5D, Bronx, New York and 2117 Haviland Avenue, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on December 28, 2011;

g. On or about July 20, 2007, March 18, 2010, and May 12, 2011, the Pressler Defendants sent Judgment Notices related to the 2006 Lawsuit through the U.S. mail to Ms. Bernhart at 1652 Popham Avenue, MV5D, Bronx, New York and 2117 Haviland Avenue, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on August 9, 2011;

h. On or about July 27, 2011, the Pressler Defendants caused a City Marshal to send a Notice of Garnishment through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1C, Brooklyn, New York;

i. On or about August 9, 2011, Defendant Zipkin sent an Affirmation in Opposition to Ms. Bernhart's order to show cause to vacate the judgment associated with the 2006 Lawsuit through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1 C, Brooklyn, New York;

j. On or about September 7, 2011, the Pressler Defendants caused a City Marshal to send a Notice of Income Execution through the U.S. mail to Ms. Bernhart's employer;

k. On or about November 21, 2011, the Pressler Defendants caused a City Marshal to send an additional notice through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1C, Brooklyn, New York;

l. On or about December 12, 2011, the Pressler Defendants sent an Information Subpoena through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1C, Brooklyn, New York;

m. On or about December 28, 2011, Defendant Zipkin sent an Affirmation in Opposition to Ms. Bernhart's order to show cause to vacate the judgment associated with the 2005 Lawsuit through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1 C, Brooklyn, New York;

n. On or about April 12, 2012, the Pressler Defendants sent Supplemental Interrogatories through the U.S. mail to Ms. Bernhart at 30 Centre Mall, Apartment 1C, Brooklyn, New York;

o. On or about May 31, 2006, Defendants caused a process server to send a copy of a summons and complaint through the U.S. mail to Mr. Brito at 2907 Kingsbridge Terrace, Apt. 34B, Bronx, New York, according to the process server's affidavit dated May 31, 2006;

p. On or about June 8, 2006, Defendant Franklin sent a copy of a summons and complaint through the U.S. mail to Mr. Brito at 2907 Kingsbridge Terrace, Apt. 34B, Bronx, New York, according to Defendant Franklin's application for a default judgment dated October 16, 2006;

q. On or about December 15, 2006, July 18, 2008, October 29, 2009, January 31, 2011, and March 1, 2012, the Pressler Defendants sent Judgment Notices through the U.S. mail to Mr. Brito at 2907 Kingsbridge Terrace, Apt. 34B, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on July 26, 2012;

r. On or about May 1, 2012, the Pressler Defendants sent a Judgment Notice through the U.S. mail to Mr. Brito at 2907 Kingsbridge Terrace, Apt. 9G, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on July 26, 2012;

s. On or about July 26, 2012, Defendant Zipkin sent an Affirmation in Opposition to Mr. Brito's order to show cause through the U.S. mail to Mr. Brito at 611 E. 149th St., Apt. 5F, Bronx, New York;

t. In early February 2013, the Pressler Defendants sent a proposed Stipulation of Discontinuing Action through the U.S. mail to Mr. Brito at 611 E. 149th St., Apt. 5F, Bronx, New York;

u. On or about September 7, 2012, Defendant Zipkin sent an Affirmation in Opposition through the U.S. mail to Mr. Roberts at 3660 Waldo Avenue, Apartment 4H, Bronx, New York;

v. On or about June 30, 2006, Defendants caused a process server to send a copy of the summons and complaint through the U.S. mail to Mr. "Virueto" at 539 Coster Street, Apartment 4, Bronx, New York, according to the process server's affidavit dated June 30, 2006;

w. On or about July 17, 2006, Defendant Franklin sent a copy of the summons and complaint through the U.S. mail to Mr. "Virueto" at 539 Coster Street, Apartment 4, Bronx, New York, according to Defendant Franklin's application for default judgment dated November 22, 2006;

x. On or about December 19, 2006 and February 15, 2008, Pressler Defendants sent Judgment Notices through the U.S. mail to Mr. "Virueto" at 1465 Washington Avenue, Apartment 2H, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on October 11, 2012;

y. On or about April 21, 2010, the Pressler Defendants sent a Judgment Notice through the U.S. mail to Mr. "Virueto" at 4366 White Plains Road, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on October 11, 2012;

z. On or about July 28, 2011, the Pressler Defendants sent a Judgment Notice through the U.S. mail to Mr. "Virueto" at 257 Wyckoff Avenue, Apartment 1R, Brooklyn, New York, according to the Affirmation signed by Defendant Zipkin on October 11, 2012;

aa. On or about October 6, 2011, the Pressler Defendants sent a Judgment Notice through the U.S. mail to Mr. "Virueto" at 7101 35th Avenue, Apartment 8, Jackson Heights, New York, according to the Affirmation signed by Defendant Zipkin on October 11, 2012;

bb. On or about September 14, 2012, the Pressler Defendants sent a Judgment Notice through the U.S. mail to Mr. "Virueto" at 1074 Summit Avenue, Apartment 2B, Bronx, New York, according to the Affirmation signed by Defendant Zipkin on October 11, 2012;

cc. On or about September 21, 2012, the Pressler Defendants caused a City Marshal to send a Notice of Garnishment through the U.S. mail to Mr. "Virueto" at 1074 Summit Avenue, Apartment 2B, Bronx, New York;

dd. On or about October 11, 2012, Defendant Zipkin sent an Affirmation in Opposition to Mr. Viruet's order to show cause through the U.S. mail to Mr. "Virueto" at 1134 East 165th Street, Apartment 1A, Bronx, New York;

ee. On or about December 28, 2012, the Pressler Defendants caused a City Marshal to send a Notice of Income Execution through the U.S. mail to Mr. Viruet's employer, Avant Business Services, at 60 East 42nd Street, New York, New York;

ff. Defendants have used the mails and wires on thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.


511. Defendants have used the mails and wires in connection with every default judgment that they have fraudulently obtained, and each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and representations.

512. Each and every Defendant has specific knowledge that the mails and wires are being utilized in furtherance of the

overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because the CPLR and other governing statutes make use of the mails and wires mandatory. Indeed, no default judgment can be obtained without approximately half a dozen uses of the mail and wires, and frequently more.

513. Each of the thousands of uses of the mails and wires in connection with Defendants' scheme to defraud, spanning a period of no fewer than eight years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

514. In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

*Relationship of Pattern of Racketeering Activity to Enterprise*

515. The goal of Defendants' Enterprise is to collect debts that Defendants cannot prove through fraudulently and deceptively filing and pursuing debt collection actions, fraudulently obtaining default judgments in those actions, and using those judgments to extract money and property from Plaintiffs and putative class members.

516. The pattern of racketeering activity described above is integral to Defendants' scheme. Without engaging in mail and wire fraud, Defendants would be unable to obtain the default judgments they seek.

517. Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each Defendant has violated 18 U.S.C. § 1962(c).

518. As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs and putative class members have suffered substantial injuries. Defendants' actions in violation of 18 U.S.C. § 1962(c) have caused Plaintiffs and putative class members to have default judgments entered against them which have then been used to extract money from them by restraining and executing on their bank accounts, garnishing their wages, damaging their credit ratings, causing them to incur costs and lose income, and/or leveraging these and other means to secure their agreements to pay money to Defendants, thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C. § 1964.

519. Defendants' misrepresentations secured the default judgments that caused concrete injury to Plaintiffs' property. As a result, Plaintiffs have suffered damage to their property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants in violation of 18 U.S.C. § 1962(c).

520. Defendants' conduct has involved and continues to pose a threat of long-term illegality since it is believed to have commenced eight years ago and has continued to the present. The pattern of racketeering activity has been directed towards thousands of persons, including Plaintiffs, and the pattern has spanned many years.

521. For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains, and to refrain from engaging in similar conduct in the future.

### THIRD CAUSE OF ACTION

### (Civil RICO, 18 U.S.C. § 1962(d))

522. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 445 above.

523. In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that, beginning no later than early 2005 and continuing through today, they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described above.

524. The volume and frequency of the fraudulent activity, and the continuance of the scheme for over eight years, could not have occurred without the consent and knowing collusion of Defendants and other conspirators.

525. As part of, and in furtherance of, their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

526. Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. § 1962(d).

527. By reason of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to compensatory and treble damages in an amount to be determined at trial.


## FOURTH CAUSE OF ACTION

### (NY GBL § 349)

528. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 451 above.

529. New York General Business Law section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

530. An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

531. Defendants engaged in deceptive acts and practices in the conduct of their businesses.

532. Defendants' conduct has had a broad impact on consumers at large.

533. Defendants committed the deceptive acts and practices willfully and/or knowingly.

534. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiffs and class members and unless enjoined, will cause further irreparable injury.

535. Defendants' violations include, but are not limited to:
a. Commencing suits against Plaintiffs without undertaking a meaningful review of each claim;

b. Commencing suits against Plaintiffs without any verifiable basis for each claim and without the ability or intent to obtain the documentation necessary to prove each claim;

c. Falsely verifying complaints;

d. Seeking amounts not expressly authorized by agreement;

e. Filing or causing to be filed false affidavits of service;

f. Filing false Affidavits of Facts in support of applications for default judgments;

g. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments;

h. Taking actions to execute judgments, including garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments;

i. Unlawfully retaining funds obtained through execution of judgments; and

j. Engaging in harassing, oppressive, and abusive litigation conduct.

536. As a direct and proximate result of these violations of section 349 of the General Business Law, Plaintiffs and putative class members have suffered compensable harm and are entitled to preliminary and permanent injunctive relief, and to recover actual and treble damages, costs and attorney's fees.

## FIFTH CAUSE OF ACTION

### (NY Jud. Law § 487)

### (Against Defendants Pressler, Franklin, Gulko, Zipkin, and Pressler John/Jane Does 1-20)

537. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 460 above.

538. The New York Judiciary Law section 487(1) states that "an attorney or counsel who ... is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law ... forfeits to the party injured treble damages, to be recovered in a civil action."

539. Defendants Pressler, Franklin, Gulko, Zipkin, and Pressler John/Jane Does 1-20 violated section 487 of the New York Judiciary Law by engaging in deceit or collusion, or consenting to deceit or collusion, with the intent to deceive courts and opposing parties.

540. Defendants committed the above-described acts willfully and/or knowingly.

541. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiffs and putative class members and unless enjoined, will cause further irreparable injury.

542. Defendants' violations include, but are not limited to:
a. Commencing suits against Plaintiffs without undertaking a meaningful review of each claim;

b. Commencing suits against Plaintiffs without any verifiable basis for each claim and without the ability or intent to obtain the documentation necessary to prove each claim;

c. Falsely verifying complaints;

d. Seeking amounts not expressly authorized by agreement;

e. Filing or causing to be filed false affidavits of service;

f. Filing false Affidavits of Facts in support of applications for default judgments;

g. Filing false and deceptive affirmations in opposition to orders to show cause seeking to vacate these default judgments;

h. Taking actions to execute judgments, including garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments;

i. Unlawfully retaining funds obtained through execution of judgments; and

j. Engaging in harassing, oppressive, and abusive litigation conduct.

543. As a direct and proximate result of these violations of section 487 of the New York Judiciary Law, Plaintiffs and putative class members have suffered compensable harm and are entitled to recover actual and treble damages.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment jointly and severally as against all Defendants:

I) Certifying this case as a class action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with a class defined as:
All individuals who have been or will be sued in New York City by Pressler as counsel for Palisades Collection and/or Asta to collect alleged AT&T Wireless debts;

II) Declaring that:

A) Defendants made false and misleading representations, used deceptive means, and engaged in unfair and abusive practices, in violation of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§1692d, 1692e, and 1692f, when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct;

B) Defendants form an enterprise and constitute an association-in-fact within the meaning of 18 U.S.C. §1961(4) and that this enterprise is engaged, directly or indirectly, in a pattern of racketeering activity in violation of 18 U.S.C. §§1962(c) and (d) by using mails and wires to perpetrate a scheme to defraud and to obtain money or property, and that this scheme includes but is not limited to (i) commencing suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commencing suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filing or causing to be filed falsely verified complaints; (iv) seeking amounts not expressly authorized by agreement; (v) filing or causing to be filed false affidavits of service; (vi) filing or causing to be filed false Affidavits of Facts in support of applications for default judgments; (vii) taking actions to execute judgments, including through garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retaining funds obtained through execution of judgments; and (ix) engaging in harassing, oppressive, and abusive litigation conduct;

C) Defendants willfully and/or knowingly engaged in deceptive acts and practices in the conduct of their business, in violation of the New York General Business Law § 349(a), when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained

through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct;

D) Defendants Pressler, Franklin, Gulko, and Zipkin willfully and/or knowingly engaged in deceit or collusion, or consented to deceit or collusion, with the intention to deceive courts and opposing parties, in violation of the New York Judiciary Law § 487(1), when they (i) commenced suits against Plaintiffs without undertaking a meaningful review of each claim; (ii) commenced suits against Plaintiffs with any verifiable basis for each claim, and without the ability or intent to obtain the documentation necessary to prove each claim; (iii) filed or caused to be filed falsely verified complaints; (iv) sought amounts not expressly authorized by agreement; (v) filed or caused to be filed false affidavits of service; (vi) filed or caused to be filed false Affidavits of Facts in support of applications for default judgments; (vii) took actions to execute judgments, including through garnishment and liens, with insufficient care, on the wrong individuals, and on the basis of fraudulently obtained default judgments; (viii) unlawfully retained funds obtained through execution of judgments; and (ix) engaged in harassing, oppressive, and abusive litigation conduct.

III) Enjoining and directing Defendants:

A) to comply with the NY CPLR in their debt collection activities;

B) to cease engaging in debt collection practices that violate the FDCPA, RICO, New York GBL § 349, and New York Jud. Law § 487;

C) to cease filing any actions to collect debts unless they have a verifiable basis for each claim, undertake a meaningful review of each claim, and have the documentation necessary to prove each claim, or the ability or intent to obtain such documentation;

D) to ensure that the process servers they hire serve process in compliance with the law in any and all future actions;

E) to produce and file Affidavits of Facts in future actions that truthfully and accurately reflect their personal knowledge of the facts, or lack thereof;

F) to cease engaging in harassing, oppressive, or abusive litigation conduct;

G) to notify members of the class that

(i) a judgment has been entered against them, and

(ii) that they have the right to file a motion with the court seeking to vacate that judgment and to re-open their case;

H) to provide each class member with a copy of the complaint and affidavit of service filed in his or her action; and

IV) Awarding to Plaintiffs:

A) actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

B) treble damages pursuant to RICO;

C) statutory damages pursuant to the FDCPA;

D) treble damages pursuant to GBL § 349;

E) treble damages pursuant to NY Jud. Law § 487 against the Pressler Defendants; and

D) disbursements, costs, and attorneys' fees pursuant to the FDCPA, RICO, and NY GBL § 349; and

V) Granting such other and further relief as the Court may deem just and proper.

*JURY DEMAND*

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated: New York, New York

June 27, 2013

NEW YORK LEGAL ASSISTANCE GROUP YISROEL SCHULMAN, ESQ.

By: <<signature>>

Jane Greengold Stevens, of counsel

Danielle Tarantolo, of counsel

Julia Russell, of counsel

7 Hanover Square, 18th Floor

New York, NY 10004

Telephone: (212) 613-5000

Facsimile: (212) 750-0820

Email: jstevens@nylag.org

Email: dtarantolo@nylag.org

Email: jrussell@nylag.org

HUGHES HUBBARD & REED LLP

By: <<signature>>

Diane E. Lifton

Shannon F. Green

Meaghan C. Gragg

One Battery Park Plaza

New York, New York 10004

Telephone: (212) 837-6000

Facsimile: (212) 422-4726

Email: lifton@hugheshubbard.com

Email: greens@hugheshubbard.com

Email: gragg@hugheshubbard.com

*Attorneys for Plaintiffs*