# EXHIBIT S

**EDGAR**Online

# ASTA FUNDING INC

# FORM 10-K
### (Annual Report)

## Filed 12/14/10 for the Period Ending 09/30/10

|            |                                                                          |
|-----------:|--------------------------------------------------------------------------|
| Address    | 210 SYLVAN AVE                                                           |
|            | ENGLEWOOD CLIFFS, NJ 07632                                               |
| Telephone  | 2015675648                                                               |
| CIK        | 0001001258                                                               |
| Symbol     | ASFI                                                                     |
| SIC Code   | 6153 - Short-Term Business Credit Institutions, Except Agricultural      |
| Industry   | Consumer Financial Services                                              |
| Sector     | Financial                                                                |
| Fiscal Year| 09/30                                                                    |

Powered By **EDGAR**Online
http://www.edgar-online.com
© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D. C. 20549

# Form 10-K

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended September 30, 2010**

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from         to**

**Commission file number: 0-26906**

# ASTA FUNDING, INC.

*(Exact Name of Registrant Specified in its Charter)*

| | |
|---|---|
| **Delaware** | **22-3388607** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **210 Sylvan Avenue, Englewood Cliffs, NJ** | **07632** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Issuer's telephone number, including area code: (201) 567-5648**

**Securities registered pursuant to Section 12(b) of the Exchange Act: None**

**Securities registered pursuant to Section 12(g) of the Exchange Act:**

**Common Stock, par value $.01 per share**

*(Title of Class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act  Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act  Yes ☐    No ☑

Indicate by check mark whether the registrant: (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☑          Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐    No ☑

The aggregate market value of voting and nonvoting common equity held by non-affiliates of the registrant was approximately $75,333,576 as of the last business day of the registrant's most recently completed second fiscal quarter.

As of December 10, 2010, the registrant had 14,600,423 shares of Common Stock issued and outstanding.

**Documents incorporated by reference:**

Portions of the registrant's Proxy Statement for the 2011 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended September 30, 2010.

**FORM 10-K**

**TABLE OF CONTENTS**

**Page**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 23 |
| Item 2. | Properties | 23 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | (Removed and Reserved) | 23 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6. | Selected Financial Data | 26 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 27 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 8. | Financial Statements and Supplementary Data | 40 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 40 |
| Item 9A | Controls and Procedures | 40 |
| Item 9B. | Other Information | 43 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 43 |
| Item 11. | Executive Compensation | 43 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 43 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 43 |
| Item 14. | Principal Accounting Fees and Services | 43 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 43 |
| EX-21.1 | | |
| EX-23.1 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-32.1 | | |
| EX-32.2 | | |

2

**Caution Regarding Forward Looking Statements**

This Annual Report on Form 10-K contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical facts included or incorporated by reference in this annual report on Form 10-K, including without limitation, statements regarding our future financial position, business strategy, budgets, projected revenues, projected costs and plans and objective of management for future operations, are forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expects," "intends," "plans," "projects," "estimates," "anticipates," or "believes" or the negative thereof or any variation there on or similar terminology or expressions.

We have based these forward-looking statements on our current expectations and projections about future events. These forward-looking statements are not guarantees and are subject to known and unknown risks, uncertainties and assumptions about us that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements. Important factors which could materially affect our results and our future performance include, without limitation, our ability to purchase defaulted consumer receivables at appropriate prices, changes in government regulations that affect our ability to collect sufficient amounts on our defaulted consumer receivables, our ability to employ and retain qualified employees, changes in the credit or capital markets, changes in interest rates, deterioration in economic conditions, negative press regarding the debt collection industry which may have a negative impact on a debtor's willingness to pay the debt we acquire, and statements of assumption underlying any of the foregoing, as well as other factors set forth under "Item 1A. Risk Factors" beginning on page 14 of this report and "Item 7 — Management's Discussions and Analysis of Financial Condition and Results of Operation" below.

All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the foregoing. Except as required by law, we assume no duty to update or revise any forward-looking statements.

Part I

**Item 1.   *Business.***

*Overview*

Asta Funding, Inc., together with its wholly owned significant operating subsidiaries Palisades Collection LLC, Palisades Acquisition XVI, LLC ("Palisades XVI"), VATIV Recovery Solutions LLC ("VATIV") and other subsidiaries, not all wholly owned, and not considered material (the "Company"), is engaged in the business of purchasing, and managing for its own account:

- Primary charged-off receivables consisting of accounts that have been written-off by the originators and may have been previously serviced by collection agencies;

- Semi-performing receivables consisting of accounts where the debtor is currently making partial or irregular monthly payments, but the accounts may have been written-off by the originators;

- Performing receivables consisting of accounts where the debtor is making regular monthly payments that may or may not have been delinquent in the past; and

- Distressed consumer receivables consisting of the unpaid debts of individuals to banks, finance companies and other credit and service providers.

A large portion of our distressed consumer receivables are MasterCard ® , Visa ® and other credit card accounts which were charged-off by the issuers or providers for non-payment. We acquire these and other consumer receivable portfolios at substantial discounts to their face values. The discounts are based on the characteristics (issuer, account size, debtor location and age of debt) of the underlying accounts of each portfolio.

We operate solely in the United States in one reportable business segment.

Prior to purchasing a portfolio, we perform a qualitative and quantitative analysis of the underlying receivables and calculate the purchase price which is intended to offer us an adequate return on our investment after servicing expenses. After purchasing a portfolio, we actively monitor performance and review and adjust our collection and servicing strategies accordingly.

We purchase receivables from credit grantors and others through privately negotiated direct sales, brokered transactions and auctions in which sellers of receivables seek bids from several pre-qualified debt purchasers. We fund portfolios through a combination of internally generated cash flow and bank debt, if needed.

Our objective is to maximize our return on investment in acquired consumer receivable portfolios. As a result, before acquiring a portfolio, we analyze the portfolio to determine how to best maximize collections in a cost efficient manner and decide whether to use our internal servicing and collection department, third-party collection agencies, attorneys, or a combination of all three options.

When we outsource the servicing of receivables, our management typically determines the appropriate third-party collection agencies and attorneys based on the type of receivables purchased. Once a group of receivables is sent to third-party collection agencies and attorneys, our management actively monitors and reviews the third-party collection agencies' and attorneys' performance on an ongoing basis. Based on portfolio performance considerations, our management will either (i) move certain receivables from one third-party collection agency or attorney to another or to our internal servicing department if it anticipates that this will result in an increase in collections, or (ii) sell portions of the portfolio accounts. Our internal collection unit, which currently employs approximately 40 collection-related staff, including senior management, assists us in benchmarking our third-party collection agencies and attorneys, and provides us with greater flexibility for servicing a percentage of our consumer receivable portfolios in-house.

We are a Delaware corporation whose principal executive offices are located at 210 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. We were incorporated in New Jersey on July 7, 1994 and were reincorporated in Delaware on October 12, 1995, as the result of a merger with a Delaware corporation. We were formed as an affiliate of Asta Group, Incorporated (the "Family Entity"), an entity owned by Arthur Stern, our Chairman

4

Emeritus, Gary Stern, our Chairman, President and Chief Executive Officer, and other members of the Stern family, to purchase, at a small discount to face value, retail installment sales contracts secured by motor vehicles. We became a public company in November 1995. In 1999, we capitalized on our management's more than 40 years of experience and expertise in acquiring and managing consumer receivable portfolios for the Family Entity. As a result, we ceased purchasing automobile contracts and, with the assistance and financial support of the Family Entity and a partner, purchased our first significant consumer receivable portfolio. Since then, the Family Entity ceased acquiring consumer receivable portfolios and, accordingly, does not compete with the Company.

## Industry Overview

The purchasing, servicing and collection of charged-off, semi-performing and performing consumer receivables is an industry that is driven by:

- increasing levels of consumer debt;

- increasing defaults of the underlying receivables; and

- increasing utilization of third-party providers to collect such receivables.

### *Strategy*

Although we are in a challenging economic period and an enhanced regulatory environment, our primary objective remains to utilize our management's experience and expertise by identifying, evaluating, pricing and acquiring consumer receivable portfolios and maximizing collections of such receivables in a cost efficient manner. Our strategies include:

- managing the collection and servicing of our consumer receivable portfolios, including outsourcing a majority of those activities to maintain low fixed overhead;

- selling accounts on an opportunistic basis, generally when our efforts have been exhausted through traditional collecting methods, or when we can capitalize on pricing during times when we feel the pricing environment is high; and

- capitalizing on our strategic relationships to identify and acquire consumer receivable portfolios as pricing, financing and conditions permit.

Because our purchases of new portfolios of consumer receivables has been reduced, we expect to see a corresponding reduction in finance income in future quarters and future years, to the extent we have not replaced our receivables acquired for liquidation. Instead, we focused on reducing our debt and being highly disciplined in our portfolio purchases. We continue to review potential portfolio acquisitions regularly and will buy at the right price, where we believe the purchase will yield our desired rate of return.

We believe that, given our management's experience and expertise, along with the fragmented yet growing market in which we operate, as we implement this short-term strategy, we will be in position to again grow our business when economic conditions stabilize.

## Consumer Receivables Business

### *Receivables Purchase Program*

We purchase bulk receivable portfolios that include charged-off receivables, semi-performing receivables and performing receivables. These receivables consist primarily of MasterCard ® , Visa ® and private label credit card accounts, among other types of receivables.

In the past we have acquired, directly and indirectly, through the consumer receivable portfolios that we acquire, secured consumer asset portfolios, consisting primarily of receivables secured by automobiles.

5

We identify potential portfolio acquisitions on an ongoing basis through:

- our relationships with industry participants, financial institutions, collection agencies, investors and our financing sources;

- brokers who specialize in the sale of consumer receivable portfolios; and

- Other sources.

Historically, the purchase prices of the consumer receivable portfolios we have acquired have ranged from less than $100,000 to approximately $15,000,000; however, we acquired one group of portfolios in March 2007 for $300 million (the "Portfolio Purchase"). As a part of our strategy to acquire consumer receivable portfolios, we have, from time to time, entered into, and may continue to enter into, participation and profit sharing agreements with our sources of financing and our third-party collection agencies and attorneys. These arrangements may take the form of a joint bid, with one of our third-party collection agencies, collection attorneys, or financing sources that assist in the acquisition of a portfolio and provides us with more favorable non-recourse financing terms or a discounted servicing commission. Current participation agreements include an approximate 50% sharing arrangement after we have recouped 100% of the cost of the portfolio purchase plus the cost of funds.

We utilize our relationships with brokers, third-party collection agencies and attorneys, and sellers of portfolios to locate portfolios for purchase. Our senior management is responsible for:

- coordinating due diligence, including, in some cases, on-site visits to the seller's office;

- stratifying and analyzing the portfolio characteristics;

- valuing the portfolio;

- preparing bid proposals;

- negotiating pricing and terms;

- negotiating and executing a purchase contract;

- closing the purchase; and

- coordinating the receipt of account documentation for the acquired portfolios.

The seller or broker typically supplies us with either a sample listing or the actual portfolio being sold, through an electronic form of media. We analyze each consumer receivable portfolio to determine if it meets our purchasing criteria. We may then prepare a bid or negotiate a purchase price. If a purchase is completed, management monitors the portfolio's performance and uses this information in determining future buying criteria including pricing. An integral part of the acquisition process is the oversight by our Investment Committee. This committee, established in January 2008, must review and approve all investments above $1 million in value. Voting criteria are more stringent as the size of the investment increases. The current members of the committee are the Chairman Emeritus, the Chief Executive Officer, the Chief Financial Officer, and the Senior Vice President. As the Chairman Emeritus and Chief Executive Officer are related family members, at least one other officer must approve transactions.

After determining that an investment should yield an adequate return on our acquisition cost after servicing fees, including court costs, we use a variety of qualitative and quantitative factors to calculate the estimated cash flows. The following variables are analyzed and factored into our original estimates:

- the number of collection agencies previously attempting to collect the receivables in the portfolio;

- the average balance of the receivables;

- the age of the receivables (as older receivables might be more difficult to collect or might be less cost effective);

- past history of performance of similar assets — as we purchase portfolios of similar assets, we believe we have built significant history on how these receivables will liquidate and cash flow;

- number of months since charge-off;

- payments made since charge-off;

- the credit originator and their credit guidelines;

- the locations of the debtors as there are states with better regulatory environments, better collection histories, and that are better suited to attempt to collect in and ultimately we have better predictability of the liquidations and the expected cash flows all of which factor into our cash flow analysis;

- financial wherewithal of the seller;

- jobs or property of the debtors within portfolios — this is of particular importance. Debtors with jobs or property are more likely to repay their obligation and conversely, debtors without jobs or property are less likely to repay their obligation; and

- the ability to obtain customer statements from the original issuer.

We obtain and utilize, as appropriate, input including, but not limited to, monthly collection projections and liquidation rates from our third party collection agencies and attorneys, as further evidentiary matter, to assist us in developing collection strategies and in modeling the expected cash flows for a given portfolio.

Once a receivable portfolio has been identified for potential purchase, we prepare various analyses based on extracting customer level data from external sources, other than the issuer, to analyze the potential collectability of the portfolio. We also analyze the portfolio by comparing it to similar portfolios previously acquired by us. In addition, we perform qualitative analyses of other matters affecting the value of portfolios, including a review of the delinquency, charge off, placement and recovery policies of the originator as well as the collection authority granted by the originator to any third-party collection agencies, and, if possible, by reviewing their recovery efforts on the particular portfolio. After these evaluations are completed, members of our senior management discuss the findings, decide whether to make the purchase and finalize the price at which we are willing to purchase the portfolio.

We purchase most of our consumer receivable portfolios directly from originators and other sellers including, from time to time, our third-party collection agencies and attorneys, through privately negotiated direct sales, and through auction-type sales in which sellers of receivables seek bids from several pre-qualified debt purchasers. We also, from time to time, use the services of brokers for sourcing consumer receivable portfolios. In order for us to consider a potential seller as a source of receivables, a variety of factors are considered. Sellers must demonstrate that they have:

- adequate internal controls to detect fraud;

- the ability to provide post-sale support; and

- the capacity to honor put-back and return warranty requests.

Generally, our portfolio purchase agreements provide that we can return certain accounts to the seller within a specified time period. However, in some transactions, we may acquire a portfolio with few, if any, rights to return accounts to the seller. After acquiring a portfolio, we conduct a detailed analysis to determine which accounts in the portfolio should be returned to the seller. Although the terms of each portfolio purchase agreement differ, examples of accounts that may be returned to the seller include:

- debts paid prior to the cutoff date;

- debts in which the consumer filed bankruptcy prior to the cutoff date;

- debts in which the consumer was deceased prior to cutoff date; and

- fraudulent accounts.

Accounts returned to sellers for fiscal years 2010 and 2009 have been determined to be immaterial. Our purchase agreements generally do not contain any provision for a limitation on the number of accounts that can be returned to the seller.

We generally use third parties to determine bankrupt and deceased accounts, allowing us to focus our resources on portfolio collections. Under a typical portfolio purchase agreement, the seller refunds the portion of the purchase

price attributable to the returned accounts or delivers replacement receivables to us. Occasionally, we will acquire a well-seasoned or older portfolio at a reduced price from a seller that is unable to meet all of our purchasing criteria. When we acquire such portfolios, the purchase price is further discounted beyond the typical discounts we receive on the portfolios we purchase.

VATIV, our wholly-owned subsidiary located in Sugar Land, Texas, provides bankruptcy and deceased account servicing. VATIV provides us with internal experience and proprietary systems in support of servicing our own bankruptcy and deceased accounts, while also affording us the opportunity to enter new markets for acquisitions in the bankruptcy and deceased account fields.

## Receivable Servicing

Our objective is to maximize our return on investment on acquired consumer receivable portfolios. As a result, before acquiring a portfolio, we analyze the portfolio to determine how to best maximize collections in a cost efficient manner and decide whether to use a third-party collection agency or an attorney.

If we are successful in acquiring the portfolio, we can promptly process the receivables that were purchased and commence the collection process. Unlike collection agencies that typically have only a specified period of time to recover a receivable, as the portfolio owners, we have significantly more flexibility and can establish payment programs.

We presently outsource a significant amount of our receivable servicing to third-party collection agencies and attorneys. Our senior management typically determines the appropriate third-party collection agency and attorney based on the type of receivables purchased. Once a group of receivables is sent to a third-party collection agency or attorney, our management actively monitors and reviews the third-party collection agency's and attorney's performance on an ongoing basis. Our management receives detailed analyses, including collection activity and portfolio performance, from our internal servicing departments for the purpose of evaluating the results of the efforts of the third-party collection agencies and attorneys. Based on portfolio performance guidelines, our management will reassign certain receivables from one third-party collection agency or attorney to another if we believe such change will enhance collections.

At September 30, 2010 approximately 36% of our portfolios were serviced by five collection organizations. We have servicing agreements in place with these five collection organizations as well as all other third-party collection agencies and attorneys. These servicing agreements cover standard contingency fees and servicing of the accounts.

## Operations

The Operations servicing division consists of the following units:

### *Collections*

The Collection Department is responsible for making and receiving contact with and from consumers for the purpose of collecting upon the accounts contained in our consumer receivables portfolios. Collection efforts are specific to accounts that are not yet being serviced by our network of external agencies and attorneys. The Collection Department uses a friendly, customer service approach to collect on receivables and utilizes collection software, a dialer and telephone system to accomplish this goal. Each collector is responsible for:

- Initiating outbound collection calls and handling incoming calls from the consumer. If a call is received for an account that has already been outsourced to a servicer; the collector relays the corresponding contact information and directs the customer to call the servicer directly.

- Identifying the debt and iterating the benefits of paying the obligation.

- Working with the customer to develop acceptable means of satisfying the obligation. The Collection Department (and our third party network of servicers) has the ability to tailor repayment plans that accommodate the situation of the obligor by considering components including their monthly budgets and employment status.

8

- Offering (if necessary and based upon the individual situation) an obligor a discount on the overall obligation.

Additionally, the Collection Department utilizes a series of collection letters, late payment reminders and settlement offers that are sent out at specific intervals or at the request of a member of the Collection Department.

If the Collection Department cannot contact the customer by either telephone or mail, the account is skip traced through an automated process to obtain the most recent contact information for the debtor. This process employs usage of data supplied by a variety of third party databases. Once new contact information is obtained, the account is referred back to the Collections Department and collection activity is once again initiated.

Other members of the collection department are responsible for:

- Coordinating customer inquiries and assisting the collection agencies in their processes, if needed.
- Handling the repurchase process of ineligible accounts received from a Seller that may be included in a purchased portfolio.
- Working with Buyers during the transition period and post-sale process.
- Handling any issues that may arise once a purchased receivable portfolio is sold.
- Reading incoming correspondence for accounts that are currently assigned to the Collection Department, ensuring the account is handled properly, taking the initial action required and forwarding to a collector manager for follow up action.

### *Media*

The Media Department is responsible for obtaining, storing and tracking the requests and subsequent receipt of 'back-up' documents associated with specific accounts. These documents are usually requested from the seller for the purpose of substantiating the debt if the debt is disputed by the consumer or is requested by our legal department. The Media Department is also responsible for reconciling and tracking expenses incurred by the aforementioned document requests and ensuring invoices are handled timely and any errors are corrected.

### *Disputes*

The function of the dispute department is to handle any dispute received via mail, electronically or telephone. Once a dispute is communicated, the account is removed from the credit reports or reported as a dispute, investigated and resolution is obtained.

### *Correspondence*

The purpose of the correspondence department is to review, document and scan into the system any written correspondence related to our accounts. The employees are also required to notify the Department to whom the correspondence is intended to ensure appropriate action is initiated.

### Accounting and Finance

In addition to the customary accounting activities, the Accounting and Finance Department is responsible for:

- Making daily deposits of debtor payments.
- Posting payments to debtors' accounts.
- Providing senior management with daily, weekly and monthly receivable activity and performance reports.

Accounting and finance employees assist collection department employees in handling customer disputes relating to payment and balance information and handling the repurchase requests from companies to whom we have sold receivables. Additionally, the Accounting Department reviews the results of the collection of consumer receivable portfolios that are being serviced by third party collection agencies and attorneys.

9

## Collections Represented by Account Sales

Certain collections represent account sales to other debt buyers to help maximize revenue and cash flows. We believe that our business model of not having a large number of collectors, coupled with a legal strategy which is focused on attempting to perfect liens and judgments against obligors, allows us the flexibility to sell accounts at prices that are attractive to us, and, just as important, sell the less desirable accounts within our collection portfolios. There are many factors that contribute to the decision as to which receivable to sell and which to service, including:

- the age of the receivable;

- the status of the receivable — whether paying or non-paying; and

- the selling price.

Net collections represented by account sales for the fiscal years ended September 30, 2010, 2009 and 2008 were $3.5 million, $8.7 million and $20.4 million, respectively. Collections represented by account sales as a percentage of total collections for the fiscal years ended September 30, 2010, 2009 and 2008 were 3.4%, 5.9% and 9.8%, respectively.

## Marketing

We have established relationships with brokers who market consumer receivable portfolios from banks, finance companies and other credit providers. In addition, the Company subscribes to national publications that list consumer receivable portfolios for sale. We also directly contacts banks, finance companies or other credit providers to solicit consumer receivables for sale.

## Competition

Our business of purchasing distressed consumer receivables is highly competitive and fragmented, and we expect that competition from new and existing companies will continue. We compete with:

- other purchasers of consumer receivables, including third-party collection companies; and

- other financial services companies who purchase consumer receivables.

Some of our competitors are larger and more established and may have substantially greater financial, technological, personnel and other resources than we have, including greater access to the credit and capital markets. We believe that no individual competitor or group of competitors has a dominant presence in the market.

We compete in the marketplace for consumer receivable portfolios based on many factors, including:

- purchase price;

- representations, warranties and indemnities requested;

- timeliness of purchase decisions; and

- reputation.

Our strategy is designed to capitalize on the market's lack of a dominant industry player. We believe that our management's experience and expertise in identifying, evaluating, pricing and acquiring consumer receivable portfolios and managing collections, coupled with our strategic alliances with third-party collection agencies and attorneys and our sources of financing, give us a competitive advantage. However, we cannot assure that we will be able to compete successfully against current or future competitors or that competition will not increase in the future.

## Seasonality and Trends

Our management believes that our operations may, to some extent, be affected by high delinquency rates and by lower recoveries on consumer receivables acquired for liquidation during or shortly following certain holiday periods and during the summer months. In addition, on occasion the market for acquiring distressed receivables